## W. J. JONES v. R. F. GEORGE.

(Case No. 1756.)

1. WARRANTY.— A planter engaged in raising cotton purchased from a druggist an article known as "Paris Green" for the known purpose of killing cotton worms, though it was not shown that the seller warranted that the article would accomplish that purpose. *Held:*

(1) Though technically no warranty existed, there was an implied contract that the seller sold and delivered an article of the kind contracted.

(2) A warranty is an express or implied statement of something which a

party undertakes shall be a part of a contract, and, though a part of a contract, *collateral to the express object of it.*

(3) While the rights of parties who buy under an express or implied warranty as to the thing sold, and of those persons who contract for one thing, and another is delivered to them, in reference to their remedy, in some respects may differ, yet, when the thing received has been consumed in testing it, and rescission has become impracticable, the relief is the same, whether the action be on a warranty or on a breach of the contract.

2. SAME.— It was known to the druggist that the purchaser desired to buy " Paris Green " and to apply it to prevent the destruction of his cotton crop by worms, but it was not shown that the druggist did not honestly believe that he was selling and delivering the thing which he contracted to sell, or that the buyer had any idea that he was receiving in the purchase anything else. The article delivered was not " Paris Green," and on being applied to the cotton crop failed to destroy the worms, and the crop was destroyed by them. There was evidence tending to show that " Paris Green " would have destroyed the worms. In an action for damages against the druggist for the value of the crop destroyed, *held:*

(1) If the contract was made for the express purpose of avoiding a loss likely to occur from a known natural cause, which could be controlled and avoided; and if this was known to the contracting parties, and that compliance with the contract by delivering genuine " Paris Green " would have prevented the injury by destroying the thing which immediately inflicted it, then the breach of such a contract must be regarded, within the meaning of the law, as the direct cause of the injury, for which the druggist would be liable.

(2) In such case there is an immediate and natural relation between the act complained of and the injury, without the intervention of any other *independent* cause; for a cause which is subject to control, and is contemplated by the parties looking to its avoidance and control, cannot be said to be an " independent cause."

(3) An act is the proximate cause of an injury when the injury is the natural and probable consequence of the negligence or wrongful act, and which, in the light of attendant circumstances, should have been foreseen (following Milwaukee, etc., R. Co. *v.* Kellogg, 94 U. S., 475).

(4) What is the proximate cause of an injury is ordinarily a question for the jury, and is not a question of science or legal knowledge.

(5) Where civil injury has resulted from a breach of contract or from a tort, and the elements of fraud, oppression, malice or gross negligence are absent, the law gives only compensation for the actual loss sustained.

(6) The damages which a party may recover on a breach of contract are those which are incidental to and are caused by the breach, and may reasonably be supposed to have entered into the contemplation of the parties at the time of the contract (following 13 La., 404).

(7) In the case stated, the liability of the druggist was as broad under a breach of contract as if he had expressly warranted the substance which he delivered to be " Paris Green."

(8) The breach of the contract, if it resulted in the loss of the cotton crop, must be deemed the proximate cause of the loss, and the measure of damages would be the value of the crop as it stood, just before it was destroyed by the worms, with the cost of the compound used, and the further cost of its preparation and application to the cotton, with interest on the money thus expended added.

(9) Notwithstanding the breach of the contract, no recovery could be had for any loss which the planter might have avoided with ordinary care and reasonable expense (following State *ex rel. v.* Powell, 44 Mo., 436; Davis *v.* Fish, 1 G. Greene, 406, and other cases cited).

3. ACTION ON CONTRACT.— When a right or duty is created wholly by contract, it can only be enforced between the contracting parties or their privies; citing McDonald *v.* Snelling, 96 Mass. (14 Allen), 294.

4. CASES REVIEWED.— Goodloe *v.* Rogers, 10 La. Ann., 631; Lobdell *v.* Parker, 3 La., 328; Benton *v.* Fay & Co., 64 Ill., 417; Wolcott, Johnson & Co. *v.* Mount, 36 N. J. L., 266; Passinger *v.* Thorburn, 34 N. Y., 634; Ferris *v.* Comstock & Co., 33 Conn., 513; Schutt *v.* Baker, 9 Hun, 556; Milburn *v.* Belloni, 39 N. Y., 53; Houser *v.* Pearce, 13 Kan., 106; Hitchcock *v.* Hunt, 28 Conn., 343, and other cases, reviewed.

APPEAL from Galveston. Tried below before the Hon. W. H. Stewart.

W. J. Jones brought suit against R. F. George to recover on a breach of warranty. The petition alleged that, in the year 1873, appellant was a farmer, engaged in growing Sea Island cotton on his farm, in the county of Galveston; that he had planted and cultivated about one hundred and sixty acres of land in cotton on his farm; that about the month of July, 1873, his cotton was clear of grass and weeds and in a high state of cultivation, and heavily fruited with bolls and blooms, when the cotton worm began to make its appearance in the same; that appellee George was a druggist, engaged in that business in the city of Galveston. That appellant had been informed by appellee and others that the cotton worm might be destroyed and cotton saved by the use of "Royall's Patent or Receipt for Killing Worms," the principal ingredient of which was "Paris green;" that appellee informed him that he had the pure Paris green; that appellant, with a view of experimenting with Paris green to ascertain its effects upon the cotton plant, in the month of June, 1873, purchased of appellee a small quantity of what he, appellee, represented as Paris green, and applied it to the growing plant on his farm, and became satisfied that its application would not injure it; that this experiment was made long before the cotton worm made its appearance; that appellant, immediately after that experiment, applied to appellee for Paris green for the purpose of using the same in destroying the cotton worm, and so informed the appellee at the time of the purchase; that appellee sold to appellant one hundred and twenty-four pounds of an article or drug which he warranted to be genuine Paris green, but which was not Paris green, but some other harmless drug; that in July, 1873, the cotton worms made their appearance in appellant's said cotton, and, before they had done any damage, appellant,

at great trouble and expense of labor and material, to wit, in the sum of $218.60, applied the article sold as Paris green to the growing cotton and worms on his farm, in accordance with Royall's patent or receipt. That appellant applied it to one hundred and twenty-four acres of his cotton in such a manner, to wit, according to Royall's patent or receipt, as would have destroyed the cotton worms and saved the cotton if the article sold him by appellee had been genuine Paris green; that the article was not Paris green, but some other harmless drug, and that it wholly failed to destroy the cotton worm; and that, notwithstanding its application, one hundred and twenty-four acres of appellant's cotton was wholly destroyed by the cotton worms; that the cotton was of the value of $125 per acre at the time of its destruction; that appellant was a farmer, wholly unacquainted with drugs, and particularly Paris green, and in his purchase relied entirely on the representations of appellee as to the genuineness of the article sold him; that if the article sold by appellee had been genuine Paris green, it would have destroyed the cotton worm without injury to the cotton; that it was not Paris green; that, by reason of all of which, appellant lost one hundred and twenty-four acres of his said cotton, worth $125 per acre. Appellant sues for $20,000 damages.

The appellee filed general and special demurrers, which were sustained by the court below, the cause appealed to the supreme court, and at its Galveston term, 1882, the case was reversed and remanded. See Jones v. George, 56 Tex., 149. The appellee filed general and special denial. Verdict and judgment for plaintiff for $393.25, the same being for the bill of $218.60 for labor and material, with interest.

The following was assigned as error:

2. That the court erred in giving the following charge asked by the defendant: "Seventh. Plaintiff is not entitled to recover what would have been the value of his crop had not the worm destroyed it, nor its value at or before its destruction."

*Geo. P. Finlay*, for appellant, cited: Ev. W. C. Jones, p. 47; Ev. W. J. Jones, p. 52; Dunklin's Ev., p. 53; Godsey's Ev., p. 52; Tanner's Ev., p. 56; Seymour's Ev., p. 58; Mucklevoy's Ev., p. 60; Cook's Ev., p. 62; Harvin's Ev., p. 65; Patchett's Ev., p. 78; Royall's Ev., p. 71; Jones v. George, 56 Tex., 149; S. & E. T. Railway Co. v. Joachimi, 58 Tex., 452; Texas & St. Louis R. Co. v. Young, Tyler term, 1883 (60 Tex., 201); Texas & Pacific R'y Co. v. Durrett, 57 Tex., 53.

*C. L. Cleveland*, for appellee, cited: 2 Kent's Com., 478; 1 Hilliard on Con., sec. 42, p. 92, and sec. 49, p. 99; 1 Pars. on Con., 577, 584 and notes; Chandler *v.* Lopuz, 2 Crooke, p. 27; Barnard *v.* Kellogg, 10 Wall., 359; Deming *v.* Foster, 42 N. H., 165; Brantley *v.* Thomas, 22 Tex., 270; McClung *v.* Kelly, 21 Iowa, 508; Port Carbon Co. *v.* Graves, 68 Pa. St., 149; Omerod *v.* Hutto, 13 M. & W.; Cooper *v.* Newman, 45 N. H., 339; Sedgwick on Damages, p. 71; S. & E. T. R'y *v.* Joachimi, 58 Tex., 459; T. & T. R'y Co. *v.* Durrett, 57 Tex., 53; Texas & St. Louis R. Co. *v.* Young, Tyler term, 1883 (60 Tex., 201); Wright *v.* Davenport, 44 Tex., 164; Calvit *v.* McFadden, 13 Tex., 324; De la Zerda *v.* Korn, 25 Tex. Sup., 188; Scranton *v.* Tilley, 16 Tex., 185.

STAYTON, ASSOCIATE JUSTICE.—It is not pretended that the seller warranted the article sold to be such a substance as would accomplish the purpose desired by the buyer; but it is certainly true that he sold and delivered it as and for "Paris green;" that it was for this the parties mutually contracted, and that the delivery of something else was not a compliance with the contract, it not being shown that the purchaser bought the substance delivered, taking upon himself not only the risk of quality, which is the matter to which warranty applies, but also of kind. It is evident that the buyer relied on and trusted the representation of the seller.

If the article delivered had been "Paris green," but of an inferior quality, then the question would arise, the seller knowing for what purpose it was bought, whether there was an implied warranty in the sale of such an article, for such a known purpose, that the article delivered should be of a quality necessary to accomplish the purpose which a good quality of "Paris green" would accomplish, in the matter in which the buyer intended to use it.

That, however, is not this case. The appellant contracted to buy, and the appellee contracted to sell and deliver, "Paris green," and not some other substance; but "chrome green," a substance not having the properties of "Paris green," though resembling it in appearance, was delivered.

In such cases, technically, no warranty arises, but there is an implied contract that the thing sold and delivered is of the kind which the parties contract with reference to.

Speaking upon this subject an elementary writer says: "A good deal of confusion has arisen in many of the cases upon this subject from the unfortunate use of the word warranty. Two things have been confounded together. A warranty is an express or implied

statement of something which a party undertakes shall be part of a contract, and, though part of the contract, *collateral to the express* object of it.

"But in many of the cases the circumstance of a party selling a particular thing by its proper description has been called a warranty, and the breach of such a contract a breach of warranty; but it would be better to distinguish such cases as a non-compliance with a contract which a party has engaged to fulfil; as if a man offers to buy peas of another and he sends him beans, he does not perform his contract; but that is not a warranty; there is no *warranty* that he should sell him peas; the *contract* is to sell peas; and if he sells him anything else in their stead it is a non-performance of it." Benjamin on Sales, 600, and cases cited in notes; Pollock's Principles of Contracts, 465; Story on Contracts, 1079, and cases cited; 2 Sutherland on Damages, 411, and cases cited in note 1.

While the rights of parties who buy under an express or implied warranty as to quality of thing sold, and of those persons who contract for one thing and another is delivered to them, in reference to remedy in some respects may differ, yet, when rescission has become impracticable, when the thing delivered has been consumed in testing it, it would seem, whether the action be on a warranty or breach of contract, the relief would be the same.

The liability of the appellee, under the facts in evidence, is as broad as though he had warranted the substance delivered to be "Paris green." The measure of that liability, and the extent to which it might be affected by the failure of the appellant to use due care to avoid injury to himself from the appellee's breach of contract, are matters for after consideration.

In Wolcott, Johnson & Co. v. Mount, 36 N. J. Law, 266, the rule is thus stated: "The right to repudiate the purchase for the nonconformity of the article delivered to the description under which it was sold is universally conceded. That right is founded on the engagement of the vendor by such description that the article delivered shall correspond with the description. The obligation rests upon the contract. Substantially the description is warranted. It will comport with sound legal principles to treat such engagements as conditions in order to afford the purchaser a more enlarged remedy by rescission than he would have on a simple warranty; but when his situation has been changed, and the remedy, by repudiation, has become impossible, no reason supported by principle can be adduced why he should not have upon his contract such redress as is practicable under the circumstances. In that situation of

affairs the only available means of redress is by an action for damages. Whether the action shall be technically considered an action on the warranty, or an action for the non-performance of a contract, is entirely immaterial."

There is nothing in the record to indicate that the appellee did not honestly believe that he was selling and delivering the thing which he contracted to sell and deliver, nor to indicate that the appellant had the slightest idea that he was receiving anything else under his contract.

The purpose to which the appellant desired to apply the thing bought was known to the seller. It was known that the appellant desired to use it to prevent the destruction of his cotton crop by an unintelligent agency, produced by natural causes, which for years past had proved highly destructive, and which, in the natural order and course of things, might be expected from year to year, unless in some way destroyed, to re-appear and repeat the ravages of former years.

It was believed that by the use of "Paris green" in a given method the cotton worm could be destroyed and the cotton crop saved; but the success of this method remained to be tested by experience; and however the measure of the liability of the appellee may be fixed, his liability for more than the price paid for the thing, with interest on that price, depends on whether, if the article he delivered had been what he represented it, its application would have prevented the loss of the crop of the appellant in whole or in part.

In cases of this character there is great difficulty in determining the true measure of damages; this difficulty has been felt by courts at all times, and largely results from the difficulty of applying in all cases the maxim: "In law, the immediate, not the remote, cause of any event is regarded."

In some cases, seeking to find a solution of the difficulty, resort has been made to subtle distinctions and refinements applicable rather to theoretical discussions of cause and effect than to the consistent and possible administration of justice in the every-day affairs of life, which but seeks to deal with human action, and to fix and enforce the rights of persons in reference to injuries which have resulted from one to another by direct act, or from agencies not intelligent, which have been put in motion or directed by an intelligent will, without which such agency would not have proved hurtful; or, where injuries have resulted from the failure of one to restrain or prevent such unintelligent agencies from acting to the hurt of another, when it was the duty of such person, by contract or otherwise, he

having the power, to do some act by or through which such agencies would be prevented from doing the act from which the injury directly comes.

No one can be made responsible for injuries done by storm, tempest, lightning or the irruption of millions of devouring insects, by which houses, crops and other property may be destroyed, if he has in no way directed or controlled such agencies, nor failed to do some act which, by contract or otherwise, he was bound to do, by which injury would have been avoided; if, however, a person was bound by contract to have performed an act, which he failed to do, and which if done would have prevented the injury, should not the injury and consequent loss be referred rather to the breach of contract, than to the act of God or accident, which all injuries not resulting from the act of an intelligent mind are, unless they are in some way influenced by the laches or wrong of a responsible human agency?

It may be said that it is not enough to entitle a party to recover damages for breach of contract to show that without the breach of contract relied on the injury would not have been received, when the injury results from an unforeseen and unexpected cause, or from a cause which no reasonable human exertion could counteract; but if it appears that the contract was made for the express purpose of avoiding a loss likely to occur from a known natural cause, which could be controlled and avoided; that this was known to the contracting parties, and that compliance with the contract would have prevented the injury by destroying the thing which immediately inflicts it, then it is believed that the breach of such a contract must be said, within the meaning of the law, to be the direct cause of the injury.

In such case there is "an immediate and natural relation between the act complained of and the injury without the intervention of other *independent cause;*" for a cause which is subject to control and contemplated by the parties to a contract, looking to its avoidance or control, cannot be said to be an "independent cause."

As was said in Milwaukee, etc., R'y Co. *v.* Kellogg, 94 U. S., 475: "It is generally held, that, in order to warrant a finding that negligence, or an act not amounting to wanton wrong, is the proximate cause of an injury, it must appear that the injury was the natural and probable consequence of the negligence or wrongful act, and that it ought to have been foreseen in the light of the attending circumstances. . . . We do not say that even the natural and probable consequences of a wrongful act or omission

are in all cases to be chargeable to the misfeasance or nonfeasance. They are not where there is a sufficient and independent cause operating between the wrong and the injury. In such case, the resort of the sufferer must be to the originator of the intermediate cause. But when there is no intermediate efficient cause, the original wrong must be considered as reaching to the effect, and proximate to it. The inquiry must, therefore, always be whether there was any intermediate cause disconnected from the primary fault, and self-operating, which produced the injury. Here lies the difficulty. But the inquiry must be answered in accordance with common understanding."

"The true rule is, that what is the proximate cause of an injury is ordinarily a question for the jury. It is not a question of science or legal knowledge. It is to be determined as a fact, in view of the circumstances of fact attending it."

Can a cause be said to be "sufficient," "independent," or "intermediate efficient cause," if it be one which might have been controlled by means contemplated and contracted for, in such sense as to relieve a party from liability, by whose own nonfeasance or misfeasance the intermediate destroying agency is permitted to exist, if performance with his contract would have destroyed it? See, also, Wharton on Negligence, 85–156.

In this case there is evidence tending to show that, if the substance delivered by the appellee to the appellant as "Paris green," which was the substance which he sold and contracted to deliver, had been that substance, its use, under the formula and manner used, would have protected the cotton from destruction by the worms. Whether it would have done so was a question for the jury.

The parties evidently contemplated a favorable result from the use of "Paris green" in the manner proposed, as did they the probable partial or total destruction of the cotton crop if some means were not adopted by which the worm could and would be destroyed; and the vice which defeated the result contemplated by both parties was in the thing delivered; no intermediate agency except that which the thing sold was intended to destroy contributed to the loss.

Cases and authorities bearing on the question of proximate and remote cause will hereafter be presented in connection with the question of measure of damage, which are so intimately connected as to make the same authorities applicable to both questions.

On the trial of this cause, evidence having been offered tending

to show that, if "Paris green" had been delivered to the appellant in accordance with the contract, its application to the cotton in manner contemplated, as was applied the substance delivered, would have destroyed the worms which subsequently destroyed the cotton. The appellant then proposed to prove the value of the cotton as it stood before destroyed by the worms, which was objected to on the ground "that the value of the cotton did not constitute an element of actual damage in the case." This, together with the giving of a charge announcing in substance the same principle or rule, is assigned as error.

In all cases of civil injury resulting from breach of contract or from tort, with the exception of cases of tort in which the elements of fraud, oppression, malice or negligence so gross as to raise the presumption of malice, or reckless indifference to duty, in which juries have a discretion to award damages termed exemplary, the law gives, as near as may be done, compensation for the actual loss sustained. 1 Sedgwick on Damages, 34, 45, 91, 125; 1 Sutherland on Damages, 19, 20, 21, 159; Hadley v. Baxendale, 9 Exch., 341; Wolcott, Johnson & Co. v. Mount, 36 N. J. Law, 270.

Except as thus limited there is no practical difference in the rules for the determination of the measure of damages between cases arising on breach of contract and upon tort. 1 Sedgwick, 34, note (a), 129, note (b), 128, note (b), 131; Field on Damages, sec. 272; 1 Sedgwick, 217, note (a), and cases cited.

In actions based on either of these grounds the offending party is liable for the injury direct, although the damage may not have been in contemplation of the parties; and they are also further liable for such loss as would, in the ordinary or usual course of things, result from the breach of contract or tort, for the contract is supposed to have been made and broken, or the tort committed, in contemplation that the injury will thereby likely result.

The rule, largely drawn from the civil law, as laid down and followed by the English courts in the case of Hadley v. Baxendale, 9 Exch., 341, is thus stated: "We think the proper rule in such a case as the present is this: Where two parties have made a contract which one of them has broken, the damages which the other ought to receive, in respect of such breach of contract, should be either such as may fairly and substantially be considered as arising naturally, i. e., according to the usual course of things, from such a breach of contract itself, or such as may reasonably be supposed to have been in the contemplation of both parties at the time they made the contract, as the probable result of the breach of it. Now, if the

special circumstances under which the contract was actually made were communicated by the plaintiff to the defendant, and thus known to both parties, the damages resulting from the breach of such a contract which they would reasonably contemplate would be the amount of injury which would ordinarily follow from a breach of contract under these special circumstances so known and communicated. But, on the other hand, if these special circumstances were wholly unknown to the party breaking the contract, he, at the most, could only be supposed to have had in his contemplation the amount of injury which would arise generally, and in the great multitude of cases, not affected by any special circumstances, for such a breach of contract. For had the special circumstances been known, the parties might have expressly provided for the breach of contract by special terms as to the damage in that case, and of this advantage it would be very unjust to deprive them. The above principles are those by which we think the jury ought to be guided in estimating the damages arising out of any breach of contract."

This rule has been applied substantially in many cases by the courts in America, and in the case of Calvit v. McFadden, 13 Tex., 326, the spirit of the rule was thus announced by Wheeler, J.: "The difficulty, if not impossibility, of laying down any precise and definite rule of general application in respect to what may be recovered as consequential damages, is shown by Mr. Sedgwick in his review of the cases upon this subject in his treatise upon the Measure of Damages. He quotes the language of the supreme court of Louisiana, that 'the damages which a party may recover on the breach of a contract are those which are incidental to and caused by the breach, and may reasonably be supposed to have entered into the contemplation of the parties at the time of the contract' (13 La., 404); and this, he concludes, is the clearest and most definite line that can be drawn in respect to such damages. . . . And to apply the rule of the Louisiana court, which seems free from objection, it must have appeared also that the loss was incidental to and caused by the breach of the contract, and was such as may reasonably be supposed to have entered into the contemplation of the parties contracting."

In the last edition of Mr. Sedgwick's work on the Measure of Damages, 104, 122, he adopts the rule thus stated by the Louisiana court as "perhaps the clearest and most definite rule that can be framed in this perplexing matter."

The rule in Louisiana seems to be established by the code of that

state (1 Sedgwick, 103; Williams *v.* Barton, 13 La., 410); and it and its modifications are taken from the Code Napoleon, 1149, 1150, which in turn are taken from Pothier on Obligations, Nos. 159, 160, who asserts that the rule is as old as the Roman law.

We believe this to be a correct rule, and, tested by it, what is the liability of the appellee?

That he would be liable for the direct injury, *i. e.*, the difference between the value of the thing sold and the value of the thing delivered, is not questioned; but it is claimed that he is not liable for the value of the crop as it stood, as consequential damages, even if but for his breach of contract the crop would not have been destroyed.

We feel deeply the difficulty of the question, and believe that the same may be most correctly and more satisfactorily solved by an examination of the question in the light of adjudged cases, which, at the risk of extending this opinion to too great length, we will refer to.

In the case of Goodloe *v.* Rogers, 10 La. Ann., 631, the plaintiff had contracted to erect and put in operation on the plantation of the defendant a sugar mill, which the court found, in contemplation of the parties, was to be put in operation in time to take off the defendant's crop of sugar for the year 1849, and the suit was to recover the cost of erection. It was found under the defenses to the action that the contract was not complied with, and that from defects in the machinery and its mode of erection it was not sufficient to work up the cane, in consequence of which the defendant was compelled, owing to delay thus caused, to windrow his crop to preserve it from the frost, by reason of the delay caused by the plaintiff's failure to comply with his contract, which delay caused a deficiency in sugar, estimated by witness at from ten to forty per cent. of the crop. It further appeared that the delay caused the defendant to have to employ extra hands. The court held that the loss of crop and costs of extra hands were the natural and proximate results of the failure of the plaintiffs to comply with their contract, and that damages based on those losses were recoverable.

The case of Lobdell *v.* Parker, 3 La., 328, though not based on identical facts with the case above stated, in principle presented the same legal questions, and was decided in the same way. The case of Rugely *v.* Goodloe, 7 La. Ann., 296, is a like case to the two preceding, and was decided the same way.

In Benton *v.* Fay & Co., 64 Ill., 417, it appeared that the plaintiff bought a selected planing machine from the defendants, which was

to be sent to him when he should direct it by letter. He directed the machine to be sent, and the defendants refused.

On the trial the plaintiff offered to prove that he had erected a building and put in a steam-engine and shafting, at an expense of $5,000, with a view to the use of this machine; that the defendants had notice of this when the contract was made, and that it all lay idle for thirty-five days in consequence of the breach of contract.

This evidence was rejected in the court below, and on appeal the court said: " It should have been admitted, and that the plaintiff should have been allowed to show what would have been a fair rent for the use of the building and machinery, if in running order, during the time they lay idle in consequence of the refusal to deliver the machine."

It has been held in many cases where seeds of a given family were sold and represented to be seeds of a given genus of that family, which would, in their natural development, produce crops of greater value than would other seeds of the same family but of different genus, that the purchaser was entitled to recover as damages not simply the difference between the value of the seeds delivered and those for which the parties contracted, but the difference between the value of the crop raised with the seeds delivered and the value of the same quantity of crop of the more valuable genus.

The following are cases of this sort: Wolcott, Johnson & Co. v. Mount, 36 N. J. Law, 262; Passinger v. Thorburn, 34 N. Y., 634; Van Wyck v. Allen, 69 N. Y., 62; White v. Miller, 71 N. Y., 118; Flick v. Wetherbee, 20 Wis., 392; Randall v. Roper, 96 Eig. Com. Law, 82.

In Ferris v. Comstock & Co., 33 Conn., 513, which arose on sale of onion seed warranted " fresh, genuine and such as would grow," it was not questioned that loss resulting from breach of the contract, in that the seed would not germinate and grow, would entitle the purchaser to damages other than the money paid for the seed, with interest; but it was held that the true measure of damage was the value of the labor expended in planting the seed and the sum paid for the seed, with interest on the several amounts.

In this case it does not appear whether the plaintiff procured other seed after finding out the defect or not; nor whether he might have done so and therewith have raised a crop.

In Schutt v. Baker, 9 Hun, 556, hop roots represented to be female, or bearing roots, were sold, many of which proved to be male, or non-bearing roots, and it was held that the difference in the value of the

crop which might have been raised had the roots been as represented, and that produced, was the true measure of damage.

In Milburn v. Belloni, 39 N. Y., 53, coal dust was sold, to be used in the manufacture of brick, with a warranty that it was free from *soft* coal dust; the seller being informed that if mixed with soft coal dust it would destroyed the bricks proposed to be manufactured. On breach it was held that the seller was liable for such injury as resulted from the use of the coal dust which contained soft coal dust; and in that case Passinger v. Thorburn was approved, as were some English cases which will be referred to.

In Houser v. Pierce, 13 Kan., 106, the defendant, it appears, had contracted to cut, bind and stack certain oats for the plaintiff, and failed to do so, whereby they were lost; and an instruction to the effect that if the plaintiff, after using all reasonable care to prevent it, lost his crop of oats by reason solely of the failure of the defendant to perform his contract, then he was entitled to recover the amount of such loss, was held to be correct.

In Hitchcock v. Hunt, 28 Conn., 343, one person sold to another pork in barrels by contract, in which he warranted the barrels not to leak. They did leak; and it was held that if, without knowledge of the defective character of the barrels, the purchaser had suffered the pork to remain in them for a reasonable time, and it had been spoiled by the leakage, that he could have recovered the value of the pork. It, however, appeared in the case that the defect became known to the buyer in time to have procured other barrels and repacked the pork, which seems to have been the usual and proper course in such cases, by which the loss could have been avoided; and it was held that the buyer was only entitled to recover what he would have been compelled to pay for new barrels and for the repacking of the pork in them.

In Richardson v. Chynoweth, 26 Wis., 660, one person had contracted to furnish another with certain stock and material in time to be used in his business at an approaching state fair, and with direct reference to the increased trade expected on that occasion. It was alleged that the seller failed to comply, and that the purchaser, to the knowledge of the seller, was unable otherwise to obtain the goods, and it was held that the purchaser was not restricted to the difference in the contract and market price, but could recover such other damages as could be shown reasonably to have resulted from the failure of the seller to comply with the contract.

In Smeed v. Foord, 1 E. & E., Q. B., 602, it appeared that the defendant contracted to deliver to plaintiff, a farmer, a threshing ma-

chine within three weeks. It was plaintiff's practice, known to the defendant, to thresh wheat in the field, and send it thence direct to market. At the end of three weeks plaintiff's wheat was ready in the field for threshing; and on plaintiff's remonstrating at the delay in the delivery of the machine, defendant several times assured him it should be sent forthwith. Plaintiff, having unsuccessfully tried to hire another machine, was compelled to carry home and stack the wheat, which, while so stacked, was injured by rain. The machine was afterwards delivered and paid for. The wheat was then threshed; and it was found necessary from its deterioration by the rain to kiln-dry it. When dried and sent to market, it sold for a less price than it would have brought had it been threshed at the time the machine should have been delivered, the market price in the meantime having fallen. It was held, in an action by the buyer of the machine, that he was entitled to recover the expenses of stacking the wheat; such loss as arose from the deterioration of the grain by rain; and also the expense of drying it in the kiln, but recovery for decline in market price was refused.

In this case all the judges held the rule in Hadley v. Baxendale to be applicable.

In the case of Prosser v. Jones, 41 Iowa, 674, the defendant had contracted to thresh the plaintiff's wheat, timothy, oats and flax at such time as plaintiff might request it, after four days' notice was given. The facts from which loss resulted from the defendant's failure to comply with the contract were in principle the same as in the case of Smeed v. Foord, but it was held that the damage was too remote.

The case of McCormick & Bro. v. Vanatta, 43 Iowa, 389, presented facts involving the same questions — of liability on contract, remoteness of cause and measure of damage — as the cases last mentioned, and in principle, except in so far as the failure of the party asserting damage to use care to avoid injury may affect the question, stands on the same ground; but the court held that the damage was too remote.

In Randall v. Newson, 2 L. R., Q. B. Div., 102, it appeared that the plaintiff bought from the defendant a pole for his carriage. In using the carriage the horses swerved, and the pole broke, and the horses were injured, and it was held by the court that it should have been left to the jury whether the injury to the horses was or was not the natural consequence of the defect in the pole.

In Hobbs v. Davis, 30 Ga., 423, it appeared that the owner of a slave hired it to another for a year, for the purpose of working in a

crop which was subsequently planted and growing, when in the month of May the owner withdrew his slave, whereby the crop was lost. The court held that in such case the measure of damage should be the hire of the slave, the rent of the land, and all the expenses incurred and actual loss sustained by the misconduct of the defendant, rather than the conjectural value of such a crop as might have been made.

French v. Vining, 102 Mass., 135, was a case in which the owner of a lot of hay on which white lead had been spilt, carefully attempted to separate that part which the poison had reached from the residue, and thought he had done so, after which he sold under circumstances such as indicated that he knew it would be fed, a portion of that which he believed to be free from the poisonous substance, and a cow to which it was fed died from its effects, and it was held that the seller was liable for her value.

The cases of Wintz v. Morrison, 17 Tex., 382; Mullett v. Mason, 1 L. R., C. P. Cases, 559; Smith v. Green, 1 L. R., C. P. Div., 92; Bradley v. Rea, 96 Mass. (14 Allen), 20; Wheeler v. Randall, 48 Ill., 182; Packard v. Slack, 32 Vt., 10; Sherrod v. Langdon, 21 Ia., 518; Rose v. Wallace, 11 Ind., 112, are all cases in which domestic animals were sold under warranty of soundness; misrepresentation as to their soundness, or concealment of the fact that they were affected with contagious diseases; and in trover it was held that the seller was responsible to his vendee for all such actual damage, whether direct or consequential, as resulted from the diseased animals, and that this embraced not only such damage as resulted through the loss or deterioration in value of the animals sold from the disease with which they were affected, but also embraced any loss which resulted from injury to or loss of animals diseased by contact with the infected animals sold.

It seems that the right to recover such actual damage, either direct or consequential, which would likely or probably result in the ordinary course of business from the buyer's relying and acting on the misrepresentation of the seller, is no broader than in cases where there is no fraud, but a warranty of soundness is given (Wood's Mayne on Damages, 230); and the same rule is applicable in cases of breach of contract to sell a named thing, which results from the delivery of something different, when the contracting parties are advised of the use to which the thing contracted for is to be applied.

The rule would be different in regard to claim for exemplary damages, in which motive becomes an element. As we have before

said, the liability of the appellee is as broad under the breach of contract as though he had expressly warranted the substance which he delivered to be "Paris green."

The following cases, English and American, may be profitably consulted upon the question of proximate cause, and also upon the measure of damages in cases in principle kindred to the present: Borries v. Hutchinson, 18 C. B. (N. S.), 445; Wilson v. Newport Dock Co., L. R., 1 Exch., 177; Burrows v. March Gas Co., 5 L. R., Exch., 67; S. C., 7 Exch., 96; Gee v. L. & Y. R'y Co., 6 H. & N., 215; Brown v. Edgington, 2 M. & G., 289; Scott v. Hunter, 46 Pa. St., 192; Westfield v. Mayo, 122 Mass., 100; Derry v. Flitner, 118 Mass., 131; Griffin v. Colver, 16 N. Y., 489; Jeffrey v. Bigelow, 13 Wend., 518; Watterson v. A. V. R. R. Co., 74 Pa. St., 215; Parker v. Marquis, 64 Mo., 40; Denny v. N. Y. R. R., 13 Gray, 481; Morrison v. Davis & Co., 20 Pa. St., 171; Cuff v. R. R. Co., 35 N. J. L., 32; Maynard v. Maynard, 49 Vt., 297; Davis v. Fish, 1 G. Greene, 406; Eastman v. Sanborn, 3 Allen, 594; Lawson v. Price, 45 Md., 139; McDonald v. Snelling, 96 Mass. (14 Allen), 290; Brandon v. Manufacturing Co., 51 Tex., 126; Field on Damages, 272; Hoadley v. Transportation Co., 115 Mass., 304.

Comment on the cases substantially set out, or upon the cases simply cited, cannot be made in this opinion, already too much extended; but application of the rules and principles therein announced lead us to the conclusion that the breach of contract relied on must be deemed the proximate cause of the loss of appellant's crop of cotton, if it be true that the application of "Paris green," as intended, and as was applied the substance delivered; and that as a consequence the true measure of damage to which the appellant, in such case, would be entitled is the value of the crop as it stood just before it was destroyed by the worms, with the cost of the compound used, and the further cost of its preparation and application to the cotton added, with interest on the money thus expended, the application of the compound having been rendered inefficient by the breach of contract. The value of the crop as it stood was not a matter of such uncertainty as to preclude its ascertainment. S. & E. T. R'y Co. v. Joachimi, 58 Tex., 456.

When this cause was before this court on a former occasion (56 Tex., 152), it was said: "No principle is more firmly established than that remote and speculative damages cannot be recovered on account of a breach of contract, when that breach is unmixed with the elements of force or fraud."

The appellant was then seeking to recover what might have been

the value of the cotton crop had it matured.   It was further said:
" Taking as true the representations in appellant's petition, he would
be entitled to recover the actual expenses incurred in the purchase
and application of the compound to the cotton and the loss of time
necessary therefor, together with any other element of actual dam-
ages that result to him as a natural or legal sequence from the
breach of warranty."   This rule was correct, and embraces the ele-
ments of damage which we now hold must be considered.   The case
when formerly presented probably did not present or call for a rul-
ing on the point now directly presented.

If, however, notwithstanding the breach of contract, the appellant,
by the use of ordinary care, and at reasonable expense, could have
avoided the loss in whole or in part, then the loss which might
have been arrested by the use of such care ought not to be recov-
ered.

The rule is thus stated:  " The same principle which refuses to take
into consideration any but the direct consequences of the illegal act
is applied to limit the damages where the plaintiff, by using reason-
able precautions, could have reduced them."   " If," said Lord Chief
Justice Abbott at nisi prius, " you charge anybody with a loss
arising from mistake, you should show that no due diligence could
have been used by you which might have prevented that loss."   " It
is not only the moral but the legal duty of a party who seeks re-
dress for another's wrong to use due diligence in preventing loss
thereby.   This principle applies to a breach of contract, and a party
is not entitled to compensation for injurious consequences from such
breach, so far as he had the information, time and opportunity neces-
sary to prevent them."   1 Sedgwick, 164, 165.

These principles have been recognized and applied in many cases,
and are wholesome in their operation.   Mather v. Butler County, 28
Iowa, 259; State ex rel. v. Powell, 44 Mo., 440; Miller v. Mariners'
Church, 7 Greenl., 56; Davis v. Fish, 1 G. Greene, 406; Hamilton v.
McPherson, 28 N. Y., 72; Milton v. Hudson R. S. Co., 37 N. Y.,
210; Lawson v. Price, 45 Md., 124; Draper v. Sweet, 66 Barb.,
145; Houser v. Pierce, 13 Kans., 106; Hobbs v. Davis, 30 Ga.,
425; Loker v. Damon, 17 Pick., 284.

In the case of T. & St. L. R. R. Co. v. Young, decided at the
last Tyler term (60 Tex., 201), a state of facts was shown in which
it was held that the aggrieved party was not bound to have per-
formed acts which would have been necessary to save his crop, but
the facts were exceptional.   It appears that the appellant resided
within six miles of this city, where presumably he might have ob-

tained "Paris green," to supply the place of that which the appellee under the contract ought to have furnished him.

In June he received a package of the substance which both parties intended to be and believed was "Paris green," for the purpose of testing whether it would prove injurious to the cotton plant. If deemed prudent to test it in this respect, it may be that due care would have required that its efficacy to destroy worms or other insects should also have been tested before buying and depending upon it.

Whether the article which the appellant supposed he was receiving, if properly applied, would have destroyed the cotton worm and preserved the cotton, it seems had not been demonstrated by experience. Both of the contracting parties evidently believed that it would.

Before the last of June the appellant had received all of the article which he supposed to be "Paris green;" but the cotton worm did not come in such numbers as to do material injury to the cotton until about the last of July, and it seems that some interval of time elapses usually after the worm first makes its appearance before it becomes greatly destructive.

Both parties were acting in good faith; there was no fraud, intentional misrepresentation or concealment; the matter was at the time largely an experiment.

Under such circumstances, it may be that the exercise of ordinary care by the appellant would have required that he should have tested the efficacy of the article which he had received, prior to the time when the worms became so numerous as to materially affect his cotton. He had heard that the substance which he believed he had would destroy the worm, and believed it; may it not have been his duty, under all the circumstances, to have tested the efficacy of the substance which he had, in the destruction of worms and other insects, or at least on the cotton worm on its first appearance, and if he found that it was not effective, should he not then have made the inquiry whether the substance he had was "Paris green?" Should he not then have suspected that the article he had was not what he contracted for? Might he, by ordinary care, have ascertained whether it was or not, and if found not to be, have procured the genuine "Paris green" in time to have preserved his crop in whole or part, as he subsequently did, and preserved a part of his crop last attacked by the worm?

These were questions of which, in such a case as this, inquiry

should have been made by the jury, and if in reference to such matters it was found that the appellant had not used that ordinary care which a prudent man would have used under the circumstances, then he ought not to recover for such loss of his crop as might have been avoided by ordinary care.

It appears that at the time the crop was destroyed the appellant only owned one-half of the crop, and perhaps had a lien on the other half to secure advances made to the co-owners.

If this be the true attitude of the case, then the appellant, through his subsequent purchase from the owners of the other part, cannot enforce by reason of the breach of contract made with himself alone, any claim for damage done to the co-owners of the property alone.

Hence, his right to recover damages must be restricted to such damage as was done to property, or rights in the property by way of lien, which he may have held at the time the property was destroyed; for his right to damage results from a breach of contract made with himself.

The owners of the other part of the crop, who subsequently to its destruction conveyed their interest therein, together with any right of action they might have against the appellee for his breach of contract, could not thereby clothe the appellant with a right of action which they never had.

With them the appellee had no contract, and it is well settled that when a right or duty is created wholly by contract it can only be enforced between the contracting parties or their privies. McDonald v. Snelling, 96 Mass., 294.

The other part owners of the crop, so far as the record shows, had no cause of action against the appellee, hence could convey none.

It is true, as held in G., H. & S. A. R. R. Co. v. Freeman, 57 Tex., 156, that some causes of action arising from tort may be assigned, and an action be maintained by the assignee; but that is not this case. Here the appellant sues for breach of contract, and if entitled to recover, he can only do so for such injury as resulted to himself by the breach, which will include only such damage as resulted from the destruction of his share of the crop, or for the destruction of the other share, in so far only as it may be necessary to do so to protect any lien thereon which the appellant may have had. We make this suggestion in view of another trial.

For the reasons given the judgment of the court below will be

reversed and the cause remanded, that it may be tried in accordance with the principles herein expressed. It is accordingly so ordered.

REVERSED AND REMANDED.

[Opinion delivered March 25, 1884.]

Chief Justice WILLIE did not sit in this case.