**SAN MARCOS OIL MILL v. SOYARS et al.
(No. 6673.)**

(Court of Civil Appeals of Texas. Austin.
June 11, 1924. Rehearing Denied
Oct. 15, 1924.)

1. **Trial ⟐350(4)—Special issue as to damages
from feeding cattle food purchased from de-
fendant held erroneous in view of evidence as
to other causes of illness.**

In action by cattle owners against sellers
of cotton hulls for breach of contract that the
hulls were to be prime, in view of evidence that
sickness of plaintiffs' cattle might have been due
in part to causes other than poisonous hulls,
a special issue calling for the difference in mar-
ket value immediately before and immediately
after they became sick was error, and should
have been corrected so as to relate to the loss
which plaintiffs sustained by reason of impure
or poisonous hulls.

2. **Depositions ⟐68—Admission of certifi-
cate of chemical analysis held proper.**

In action by cattle owners against seller of
cotton seed hulls for damages to cattle from
breach of defendant's contract to supply prime
hulls for feeding, where a chemist analyzed a
sample of the hulls and sent both originals
and copies of certificates of the analysis to
plaintiffs' attorney, and did not keep a copy,
and plaintiffs' attorney identified the certifi-
cates admitting them in evidence in connection
with the chemist's deposition was proper.

3. **Depositions ⟐68—Failure by chemist to
mention presence of chemical in samples in
deposition held not to render certificate of
analysis inadmissible.**

In an action by cattle owner against a sell-
er of cotton seed hulls for damages from breach
of contract to supply prime hulls for feeding,
though an expert chemist in a deposition did
not mention a chemical as one of the poisons
found by him in a sample, the certificate of
analysis which mentioned the chemical held not
thereby rendered inadmissible.

4. **Evidence ⟐508—Testimony of chemist as
to presence of poison in food and fitness for
cattle held competent.**

In an action by cattle owner against a sell-
er of cotton seed hulls, for breach of contract
to supply prime hulls for feeding, where a wit-
ness qualified as an expert in chemical analysis
of cotton seed hulls, his testimony that he
found two poisons in a sample analyzed by him,
and his statement that he would not recom-
mend the use of the sample to any one who
desired prime, fresh hulls, was competent.

5. **Appeal and error ⟐1050(1)—Evidence ⟐
317(10), 536—Hearsay testimony by chemist
as to injurious effect of chemical held ob-
jectionable as hearsay and as being on a sub-
ject on which he was not qualified to testify,
but not reversible error.**

In an action by a cattle owner against a
seller of cotton seed hulls for feeding, for
breach of contract to supply prime hulls, tes-
timony of a chemist who analyzed samples of
the hulls, and who had found choline therein,

as to what was said concerning the strength
of a poison similar thereto, but stronger than
the one in question, was objectionable as hear-
say and as being on a subject on which witness
showed he was not qualified to testify as an
expert, but was not of sufficient importance to
be reversible error.

**On Motion for Rehearing.**

6. **Sales ⟐446(1)—Refusal of charge permit-
ting inference that buyer under express war-
ranty had duty to inspect held proper.**

The purchaser of cotton seed hulls for
feeding had right to rely on seller's expressed
warranty of soundness, and assume that hulls
were serviceable for purpose for which sold,
and refusal of a special charge susceptible of
construction, by inference, that some duty of
inspection rested on plaintiffs, was proper.

Appeal from District Court, Hays County;
M. C. Jeffrey, Judge.

Action by W. B. Soyars and another
against the San Marcos Oil Mill. From a
judgment for plaintiffs, defendant appeals.
Reversed and remanded.

Barber & Johnson, of San Marcos, for ap-
pellant.

R. E. McKie and L. D. Hill, both of San
Marcos, for appellees.

McCLENDON, C. J. Appellees, W. B.
Soyars and his son, Irwin Soyars, as part-
ners in the cattle business, brought this suit
against appellant, the San Marcos Oil Mill,
for damages for the alleged breach of a con-
tract by which appellant sold appellees cer-
tain cotton seed hulls, which according to the
contract were to be "prime of this season's
manufacture." The hulls were sold for the
purpose of being fed to cattle, and the dam-
ages sought to be recovered were for sickness
caused to plaintiffs' cattle by reason of im-
pure or poisonous hulls. The case was tried
to a jury upon special issues, and upon the
answers of the jury judgment was rendered
in favor of plaintiffs for $1,075. From this
judgment the oil mill has appealed.

The case is briefed under seven assign-
ments of error, which are also asserted as
points or propositions. The seventh proposi-
tion is based upon objections to issue No. 4,
which the court submitted to the jury. The
fifth proposition is based upon the refusal
of the trial court to submit to the jury the
question of contributory negligence of plain-
tiffs, in feeding impure or poisonous hulls
to their cattle. The remaining propositions
relate to the action of the trial court in ad-
mitting, over appellant's objections, certain
portions of the testimony of Herman A. Nest-
er, a chemist, who made an analysis of the
hulls. These propositions will be considered
in the order named.

[1] The issues submitted and the jury's
answers thereto follow:

"(1) Did the defendant San Marcos Oil Mill furnish to plaintiffs cotton seed hulls which were impure, unwholesome, or poisonous? Ans. Yes.

"(2) Did the eating of such cotton seed hulls by plaintiffs' cattle proximately cause them or a part of them to become sick? Ans. Yes.

"(3) Were plaintiffs' cattle depreciated in their reasonable market value by reason of such sickness? Ans. Yes.

"(4) What was the difference, if any, in the reasonable market value of plaintiffs' cattle at San Marcos immediately before said sickness and immediately after same? State amount if any in dollars and cents. Ans. $1,075."

The objections to the fourth special issue were: (1) That it did not submit the proper measure of damages; (2) that it assumed that all the difference in market value to the cattle resulted from causes for which defendant was responsible; and (3) that it should, but did not, call for findings upon the theory or predicate that the difference in market value may have existed without the fact thereof having been due to eating the alleged unsound hulls.

The cattle in question consisted of about 400 head of calves of varying ages, which had been shipped in December, 1921, from Uvalde to San Marcos, and were there placed upon feed for the purpose of being fattened for market. Shortly after they arrived at San Marcos they contracted hemorrhagic septicæmia; for which they were given a serum treatment. Whether all of the calves fully recovered from this trouble was an issuable fact under the evidence. The evidence also would warrant findings that the illness of the cattle was caused or more or less contributed to by one or more or all of the following circumstances: That some of the calves were too young to be put on feed; that some of them were what the witnesses described as "dirt -eaters"; that there were not sufficient facilities in the pens in the way of feeding troughs to permit all the calves to be properly nourished; and that the plaintiffs fed to the calves a too highly concentrated diet, that is, that the amount of cotton seed meal fed with the hulls was too great. It is only necessary, we think, to state that these issues were raised, without detailing the evidence upon them.

Under this state of the evidence the objections to the fourth issue were well taken, and should have been sustained. The measure of damages was the loss which plaintiffs sustained by reason of hulls which were impure or poisonous. The question for the jury to determine was the difference, if any, between the market value of the cattle in their condition by reason of eating impure or poisonous hulls, and what their market value would have been had the hulls not been impure or poisonous, but of the quality contracted to be sold. Special issue No. 4 call-

ed for the difference in the market value of the cattle immediately before and immediately after they became sick. In view of the fact that the evidence would warrant a finding that their sickness was not altogether due to a breach of the contract sued upon, but might have been due in part to other causes, the charge submitted does not necessarily embrace the measure of plaintiffs' damages, and therefore should have been corrected in accordance with the objections urged against it.

Appellant requested and the court refused the following special issue:

"Gentlemen, if you should find in response to other issues submitted to you that the hulls received by plaintiffs from the defendant were of the quality called for by the contract between the parties, or that same were not the producing cause of any injuries to the cattle complained of by the plaintiffs, you will not answer the issue hereinbelow submitted to you; but if you do not so find, then you will answer the following question or issue:

"At the time plaintiffs were receiving and using the hulls in question, did they or either of them know, or could they or either of them have known by the exercise of reasonable care, the quality or condition of the hulls being so by them used."

The evidence showed that the hulls were contained in a warehouse some 50 feet wide and 160 feet long. Quite a number of other parties were feeding cattle from hulls in the warehouse, and the evidence shows that all of the feeders drove their wagons or trucks into the warehouse where they loaded the hulls and hauled them to the respective places of feeding. There was a door at the south and another at the north end of the warehouse. The hauling was done for plaintiffs by Irwin Soyars, who testified that up until early in March he hauled hulls from the south door, but that on account of the number of trucks hauling from that door he began early in March to haul from the north door. From the testimony of defendant's witnesses, it appears that during the latter part of March some damaged seed were milled and the hulls dropped into the north end of the warehouse, but that these hulls were placed to one side of the warehouse, separate from the rest. The evidence of plaintiffs, however, was that when they began to notice that the calves were becoming sick, about March 28th, or a few days before that, they examined the hulls both at the north and the south end of the warehouse, and those at the north end were perceptibly rancid or musty, and of a darker color than those at the south end. The evidence was sufficient to warrant a finding that the damaged condition of the hulls as testified to by the plaintiffs was obvious, and therefore to warrant a further finding that plaintiffs were negligent in feeding them to their cattle. Under these circum-

stances, we think the special issue requested by appellant should have been given.

"It is well settled, that it is not only the moral but the legal duty of one who seeks redress for another's wrong to use due diligence to prevent loss thereby. The principle applies to a breach of contract, and a party is not entitled to compensation for injurious consequences from such breach, so far as he had the information, time, and opportunity necessary to prevent them." Brandon v. Mfg. Co., 51 Tex. 121.

Among numerous authorities to the same effect we cite the following: Jones v. George, 61 Tex. 345, 48 Am. Rep. 280; Brush v. Smith, 111 Iowa, 217, 82 N. W. 467; Northern Supply Co. v. Wangard, 123 Wis. 1, 100 N. W. 1066, 107 Am. St. Rep. 984; Cedar Rapids Co. v. Sprague Co., 280 Ill. 386, 117 N. E. 461, L. R. A. 1918B, 200; 8 R. C. L. 444; 35 Cyc. 478. The following is quoted from 8 R. C. L. 444:

"It is also an elementary principle that a party claiming damages must not be in fault in contributing to them by his own want of proper care; and such care must extend to the protection from further loss after the act complained of."

[2] Passing to the objections to the testimony of the witness Nester: It was in evidence that plaintiffs had taken two samples of the hulls, one from the north and the other from the south end of the warehouse, marked No. 1 and No. 2, respectively, and these samples were sent by plaintiffs' attorney to the witness, at San Antonio, who was an expert chemist, and who conducted a chemical laboratory with special reference to analyzing stock feed. Analyses of the two samples were made by Nester, and certificates thereof, signed by him, were sent to plaintiffs' attorney. These certificates show that sample No. 1 from the south end of the warehouse was prime seed and free from poisonous substances. The analysis of sample No. 2 from the north end of the warehouse contained the following:

"Choline, .06%.
"Poisons volatile—trimethylamine.
"Poisons alkaloidal—choline.
"The sample was musty and the presence of trimethylamine in the distillate would be enough to condemn it."

The witness qualified as an expert in his particular line, and testified that he made the analyses and sent both the originals and copies of the certificates to plaintiffs' attorney, and did not keep a copy. In answer to one of the direct interrogatories, asking what poisons, if any, he found in the samples, he testified:

"Sample No. 1 was the prime sample. There was no poisonous substance in it. I found choline in sample No. 2. It is a ptomaine poison."

The certificates were admitted in evidence in connection with the deposition, having been proven up by plaintiffs' attorney as those sent him by Nester. The certificate covering sample No. 2 was objected to by appellees on the ground that it was not a part of the deposition and was not testified to by the witness, and particularly that portion of the certificate giving trimethylamine as a part of the analysis found in the sample, on the ground that the witness did not testify to having found that substance in the sample. For the same reason objection was further made to the notation on the certificate to the effect that the sample was musty, and the presence of trimethylamine in the distillate would be enough to condemn it.

We think these objections are not well taken. The witness testified that he made the analyses and furnished the certificates thereof, both originals and copies, to Mr. McKie, plaintiffs' attorney, and the latter identified the certificates as being those sent him by the witness. This was sufficient predicate, we think, for introducing the certificates. Railway v. Stewart (Tex. Civ. App.) 178 S. W. 17 (writ of error refused).

[3] The fact that the witness in his deposition did not mention trimethylamine as one of the poisons found by him in sample No. 2 did not render the certificate inadmissible in evidence. The effect of such an omission upon the weight of the witness' testimony was one for the jury. The notation on the certificate that the sample was musty was merely a repetition of what witness testified to in his deposition, and the statement that the presence of trimethylamine in the distillate would be enough to condemn it was no more, in effect, than what the witness had already testified to in his deposition, wherein he stated that choline and trimethylamine are not found in normal cotton seed hulls.

[4] Objection was made to the last-stated portion of the witness' testimony, and also to a statement made by him as follows:

"As a consulting chemist, I would not recommend the use of sample No. 2 to any one who desired prime, fresh cotton seed hulls."

No valid objection could be raised to these portions of the evidence. The witness qualified as an expert in chemical analysis of cotton seed hulls. It was certainly competent for him to testify that the two poisons enumerated were not found in normal hulls, and his statement that he would not recommend the use of sample No. 2 to any one who desired prime, fresh cotton seed hulls was no more than a statement that hulls showing the analysis which he made were not of that grade.

[5] The remaining objection to this witness' testimony is to that portion of the fol-

lowing quotation which we have underscored:

"I do not know how much hulls per day an animal must have eaten and for what length of time to be injuriously affected as a result of the poisonous ingredient mentioned. A veterinary would know more about it and would know how much the animal could stand. I am not qualified to state how much of the poisonous ingredient found in sample. No. 2 would be required to injuriously affect a man, and which would require the larger amount to affect injuriously, the man or the animal. *They say that another poison that is very similar to choline requires one-twelfth of a grain to get injurious and just show poisonous symptoms, but this choline is not as strong as the one that requires one-twelfth of a grain. It is similar to it.* It is a portion of toxichology that we have not much to deal with."

The objection to the underscored portion of the quotation was that the opinion therein given by the witness was hearsay, and upon a subject upon which he showed he was not qualified to testify as an expert. These objections were well taken, and that portion of the evidence should have been excluded. However, it is obviously not of sufficient importance to require a reversal of the case.

For the errors complained of in the seventh and fifth propositions, the judgment of the trial court is reversed, and the cause remanded to that court for a new trial.

Reversed and remanded.

### On Motion for Rehearing.

[6] Upon careful consideration of appellees' motion for rehearing, we have reached the conclusion that we were in error in holding that appellant's special charge on contributory negligence should have been given. As held in our original opinion, if appellees knew of the damaged condition of the hulls, or if such condition was obvious, then appellees would be precluded from recovering for injuries to their cattle caused by the subsequent feeding of the hulls to them.

But there was no duty resting on appellees to inspect the hulls to determine their quality as cattle feed. They had the right to rely both upon appellant's express warranty of soundness and upon the assumption that the hulls were serviceable for the purposes for which they were sold. The special charge is susceptible of the construction, at least by inference, that some duty of inspection rested upon appellees, and for that reason it was properly refused. To this extent our original opinion is modified, and reversal of the trial court's judgment is rested solely upon the error of the trial court in special issue No. 4, as pointed out in our original opinion.

Appellees' motion for rehearing is accordingly overruled.

Opinion modified and motion overruled.