## GEORGE KLEVEN AND ANOTHER v. GEIGY AGRICULTURAL CHEMICALS.

227 N. W. 2d 566.

March 21, 1975—No. 44467.

*Prindle, Maland & Ward* and *W. D. Prindle,* for appellants.
*Nelson, Oyen & Torvik* and *John P. Nelson,* for respondent.

Heard before Otis, Peterson, and Scott, JJ., and considered and decided by the court en banc.

PETERSON, JUSTICE.

Plaintiffs, George and James Kleven, purchased herbicide from defendant, Ciba-Geigy Corporation, for use on their farmland near Milan, Minnesota. Plaintiffs sued defendant for breach of an express warranty of fitness and merchantability because the herbicide did not effectively provide weed control. The jury, by special verdict, found that defendant had breached an express warranty and found that, as a direct result of this breach, plaintiffs sustained damages of $2,146.20 for the reasonable cost of the herbicide and for the expenses incurred in applying the product. The trial court ordered judgment for plaintiffs in that sum.

Plaintiffs offered evidence to establish that the difference between the reasonable value of the corn actually in the field and the fair and reasonable value the corn would have had if the herbicide had been effective was $14,515. The jury, by special interrogatory, fixed this element of asserted damage, together with damages representing the cost of additional tilling, at $7,257.50. The jury, by an additional special interrogatory, found that consequential damages were excluded from defendant's express warranty. The trial court ruled that any crop losses and tilling costs sustained by plaintiff constituted consequential damages and therefore declined to order judgment for such losses. Plaintiffs for that reason appeal from the judgment. Defendant has filed a notice of review of several orders and the judgment.

The product in issue is a chemical herbicide, manufactured by defendant, known as AAtrex 80W. The bags in which the herbicide is contained are imprinted with this written warranty:

"The Directions For Use of this product reflect the opinion of experts based on field use and tests. The directions are be-

lieved to be reliable and should be followed carefully. However, it is impossible to eliminate all risks inherently associated with use of this product. Crop injury, ineffectiveness or other unintended consequences may result because of such factors as weather conditions, presence of other materials, or the manner of use or application all of which are beyond the control of Geigy or the Seller. All such risks shall be assumed by the Buyer.

"Geigy warrants that this product conforms to the chemical description on the label and is reasonably fit for the purposes referred to in the Directions For Use, subject to the inherent risks referred to above. Giegy makes no other express or implied warranty of Fitness or Merchantability or any other express or implied warranty. In no case shall Geigy or the Seller be liable for consequential, special or indirect damages resulting from the use or handling of this product. Geigy and the Seller offer this product, and the Buyer and user accept it, subject to the foregoing Conditions Of Sale And Warranty which may be varied only by agreement in writing signed by a duly authorized representative of Geigy."

■ The trial court properly denied defendant's motion for judgment notwithstanding the verdict. The motion necessarily requires the movant to accept the view of the entire evidence most favorable to the prevailing party and is to be granted only if reasonable minds could reach but one conclusion against the verdict. Brown v. Arthur Schuster, Inc. 300 Minn. 106, 217 N. W. 2d 850 (1974). We conclude that there is competent evidence on this record to sustain the verdict and the judgment.

Plaintiffs introduced evidence that there were two different types of AAtrex 80W used on three different plots of corn land. Some of the AAtrex 80W was produced at defendant's McIntosh, Alabama, plant, with the remainder produced at its St. Gabriel, Louisiana, plant. All of the AAtrex used on a 12-acre tract of corn planted by plaintiffs was manufactured at the Alabama plant, and weed control was good on that acreage. The great majority of the AAtrex used on the balance of plaintiffs' corn land,

as well as the AAtrex used on a tract belonging to another local corn farmer, came from the Louisiana plant. Weed control was poor on the acreage sprayed with the Louisiana-produced herbicide. The conditions and amount of AAtrex application were essentially similar on each of the tracts. We are not persuaded that reasonable men on a jury could not explain these facts by positing an inadequate or defective manufacture of the AAtrex coming from the Louisiana plant.

■ The trial court properly denied recovery to plaintiffs for their claimed crop damages and tilling expense on the ground that they were consequential damages excluded by the express terms of defendant's warranty. Stating that the product is "reasonably fit for the purposes referred to in the Directions For Use," the warranty specifies that "[i]n no case shall Geigy or the Seller be liable for consequential, special or indirect damages resulting from the use or handling of this product."

The basic scheme for damages arising from a breach of warranty is set out in the Minnesota Uniform Commercial Code, Article 2 (Minn. St. c. 336, Art. 2). Section 336.2—714(1) states the general rule—the buyer may recover any damages "resulting in the ordinary course of events from the seller's breach as determined in any manner which is reasonable." Section 336.2—714(2) states the time-honored formula to determine the measure of direct damages, namely, that the buyer gets the difference at the time of acceptance between "the value of the goods accepted and the value they would have had if they had been as warranted * * *."

Section 336.2—714(3) provides for the awarding of consequential damages, which are defined in § 336.2—715:

"(2) Consequential damages resulting from the seller's breach include

(a) any loss resulting from general or particular requirements and needs of which the seller at the time of contracting had reason to know and which could not reasonably be prevented by cover or otherwise; and

(b) injury to person' or property proximately resulting from any breach of warranty."

In distinguishing between direct and consequential damages, we have consistently relied on the rule expressed in Despatch Oven Co. v. Rauenhorst, 229 Minn. 436, 40 N. W. 2d 73 (1949), which involved a contract exculpating the seller from consequential damages. Consequential damages, as opposed to direct damages, were defined by the court to be those that "do not arise directly according to the usual course of things from the breach of the contract itself, but are rather those which are the consequence of special circumstances known to or reasonably supposed to have been contemplated by the parties when the contract was made." 229 Minn. 445, 40 N. W. 2d 79. Direct damages were held to arise out of the breach itself; consequential damages were damages foreseeably resulting from the breach. We held in that case that, under a contract for the sale of a seed corn dryer, the loss of profits of sales of seed corn and feed corn' caused by the breach of warranty as to the dryer's capabilities were consequential damages and therefore were not recoverable where the contract exculpated the seller from consequential damages.

Long before Despatch, we held in Frohreich v. Gammon, 28 Minn. 476, 11 N. W. 88 (1881), that loss of crops caused by the inability to harvest with a defective harvesting machine constituted consequential damages. We said there:

"* * * The rule laid down in *Hadley v. Baxendale*, 9 Exch. 341, now generally accepted as correct, and sanctioned by this court in *Paine v. Sherwood*, 21 Minn. 225, is that the damages which one party to a contract ought to receive, in respect of a breach of it by the other, are such as either arise naturally— that is, in the usual course of things—from the breach itself, or such as may reasonably be supposed to have been contemplated by the parties when making the contract as the probable result of the breach. Under the first branch of this rule fall the dam-

ages arising from the fact that a thing sold and warranted is of less value than it would have been if the warranty were true. These damages arise, in the usual course of things, *from the breach itself*; that is to say, from the breach purely, and irrespective of consequential damages. Their measure is the difference in values before indicated. An instance falling under the second branch of the rule is where one sells and warrants a thing for a particular use, upon reasonable ground for believing that, if put to such use, a certain loss to the buyer will be the probable result if the warranty is untrue. In such circumstances the seller is, under the warranty, chargeable with the loss, as one which may reasonably be supposed to have been in the contemplation of the parties when making the contract. The case where one sold and warranted a ship's cable, to be used for holding an anchor, and, in consequence of defects in it, (warranted against,) the buyer lost the anchor attached to it, and the seller was charged with the loss, falls within the second branch of the rule. *Borradaile v. Brunton*, 8 Taunt 535." 28 Minn. 481, 11 N. W. 89.

We have considered with care two cases urged upon us by plaintiffs to support a contrary holding. Liljengren Furniture & Lbr. Co. v. Mead, 42 Minn. 420, 44 N. W. 306 (1890), and Johnson v. Foley Mill. & Elevator Co. 147 Minn. 34, 179 N. W. 488, 16 A. L. R. 856 (1920).[1] In Liljengren, plaintiff sold

---

[1] We have considered, too, the cited case of Jones v. George, 61 Tex. 345 (1884). There a cotton planter purchased a substance which purported to be "Paris green," for the known purpose of killing cotton worms. The substance was not "Paris green," however, and failed to kill the worms, in consequence of which the cotton crop was destroyed. Allowing recovery for the crop loss, the Texas court said (61 Tex. 352): "[I]f it appears that the contract was made for the express purpose of avoiding a loss likely to occur from a known natural cause, which could be controlled and avoided; that this was known to the contracting parties, and that compliance with the contract would have prevented the injury by destroying the thing which immediately inflicts it, then it is

window and door frames to defendant for installation in a building defendant was constructing for rental purposes. In an action by plaintiff for the price of this material, defendant counterclaimed for loss of rents, alleging unreasonable delay in delivery of the material. In holding that defendant had failed to state facts sufficient to constitute a counterclaim for the loss of rents, Mr. Justice Mitchell wrote (42 Minn. 422, 44 N. W. 307):

"* * * [N]o extrinsic facts are alleged from which it would be implied that loss of rents of the building was in contemplation of the parties as a natural result of the failure of the plaintiff to furnish these frames and sash, or that it made the contract in contemplation of a liability for any such thing."

The issue and decision in Liljengren clearly were not framed in terms of distinguishing direct from consequential damages; rather, the court held that rental losses were not recoverable since they were not within the reasonable anticipation of the parties. Such losses are neither direct nor consequential.

Johnson v. Foley Mill. & Elevator Co. *supra*, arose out of the sale of seed wheat represented to be beardless "Marquis wheat," which proved to be instead a bearded variety of inferior quality

believed that the breach of such a contract must be said, within the meaning of the law, to be the *direct* cause of the injury.

"In such case there is 'an immediate and natural relation between the act complained of and the injury without the intervention of other *independent cause;*' for a cause which is subject to control and contemplated by the parties to a contract, looking to its avoidance or control, cannot be said to be an 'independent cause.'" (Italics supplied in part.)

We agree that this ancient case is supportive of plaintiffs' position that damage is direct, rather than consequential, where the damage sustained is in the immediate area of foreseeability by the contracting parties and where the sale was made for the specific purpose of preventing the very damage which did in fact occur; but this is not the distinguishing characteristic between direct and consequential damages in this state. This view may not be without persuasive appeal, but it cannot prevail against the case law of this jurisdiction so recently incorporated by the legislature into the Uniform Commercial Code.

and yield. The measure of damages held appropriate was "the difference between the value of the crop raised from the seed furnished, and that of a crop such as would ordinarily have been raised from the seed had it been of the variety contracted for." 147 Minn. 38, 179 N. W. 489, 16 A. L. R. 859. It is clear, again, that the court was not distinguishing between direct and consequential damages in stating this measure of damages. There was no occasion to do so, for the sales agreement in issue did not purport to exclude consequential damages.

There is, moreover, this distinction between a seed failure and a herbicide failure: If the loss occasioned by failure of seed warranted to germinate may be thought of as resulting directly from the breach of that warranty, the loss of growing corn because of weeds cannot be so considered since the weeds are the direct cause of the corn failure even though the herbicide's failure to control the weeds directly permitted their growth. The crop loss in the instant case, anticipated by the parties to occur in the event of a breach, was therefore a consequence of the herbicide's failure, and such losses would be recoverable only as consequential damages. They were not, however, recoverable because of the specific exclusion which was a part of the express warranty upon which plaintiffs relied.

■ We address ourselves, in conclusion, to plaintiffs' contention that the exclusion is in this case so unconscionable that it should not be enforced. Minn. St. 336.2—302(1) provides that unconscionable contract provisions may be either voided or limited by the court so as to avoid any unconscionable result. 21A M. S. A., § 336.2—719(1), U. C. C. Comment 1, states that every sales contract should contain at least a fair quantum of remedy for breach of duties outlined in the contract.

The Kansas Supreme Court, in a case decided subsequent to the enactment of the Uniform Commercial Code in that state but involving litigation arising prior to its enactment, sustained a claim of unconscionability in Steele v. J. I. Case Co. 197 Kan. 554, 419 P. 2d 902 (1966). There, defendant, a manufacturer of grain

combines, sold three combines to plaintiff, a farmer, under an express warranty of merchantability and fitness. A warranty exclusion clause stated that the liability of the company for any breach of warranty was limited to either replacing the machines or refunding the purchase price. The combines failed to operate properly from the beginning, and the frequent and extended efforts of defendant to remedy the defects were unavailing; during this period defendant categorically refused plaintiff's several demands for a return of the purchase price. As a consequence of these delays, plaintiff's 2,000 acres of wheat and barley crops were severely damaged.

The warranty limitation was treated as a contract of adhesion. The Kansas court emphasized that the limitation had not been brought to plaintiff's attention and that defendant knew the urgency of timely harvest and the dangers consequent upon any stoppage in operations after the grain had ripened and was ready to cut. Yet "the seller wasted thirty crucial days in attempting to remedy defects and to get the machines working, refusing during this critical time either to replace the machines with others which would operate or to repay the purchase price, even though such was demanded." 197 Kan. 563, 419 P. 2d 910. In allowing recovery of consequential damages the court circumscribed its opinion in these words (Ibid.) :

"Under the conditions outlined, we conclude that it would be unfair and inequitable to give effect to the provisions of limitation encompassed in Paragraph 5 of the warranty. In so deciding, we intend no blanket condemnation of limitations upon the liability of a warrantor nor do we mean to stigmatize provisions of limitation or exclusion as universally inimical to the public good. We hold, only, that within the framework of the facts shown to exist in this case, it would be unjust to enforce the limitation set out in Paragraph 5."

While we approve of the reasoning in Steele v. J. I. Case Co. *supra*, decided as it was on its particular facts, we reach a different disposition on the facts of the instant case. Aside from

the more obvious dissimilarities, we think the nature of the product and the risks related to its use affect the reasonableness of the exclusion in issue.

Minn. St. 336.2—719(3) provides:

"Consequential damages may be limited or excluded unless the limitation or exclusion is unconscionable. Limitation of consequential damages for injury to the person in the case of consumer goods is prima facie unconscionable but limitation of damages where the loss is commercial is not."

AAtrex 80W is a highly technical specialized chemical developed and used for selective control of certain weeds or plants growing in common with other plants. A University of Minnesota Agricultural Extension Service Bulletin in evidence reports numerous experiments with herbicides, indicating that even where the product is applied under controlled conditions by experts, there is a certain percentage of failure to obtain good control. It is general knowledge, as the trial court in that rural area noted, that the eventual yield of a farm crop, such as corn, is affected by numerous and varied factors such as soil, weather, seed, weeds, and other conditions. Considering the nature of the product itself and the multitude of conditions and factors that affect its effectiveness or its degree of effectiveness, limited favorable results could be anticipated. Finally, it is clear that the risks of failure were fairly disclosed to plaintiffs at the time of purchase in these words:

"* * * Crop injury, ineffectiveness or other unintended consequences may result because of such factors as weather conditions, presence of other materials, or the manner of use or application all of which are beyond the control of Geigy or the Seller. All such risks shall be assumed by the Buyer."

We accordingly agree with the trial court's conclusion that these facts of nature and the nature of the product make conscionable the stated exclusion of consequential damages.

Affirmed.