SOO LINE RAILROAD COMPANY et al., Appellees,

v.

FRUEHAUF CORPORATION, Appellant.

No. 76–1161.

United States Court of Appeals, Eighth Circuit.

Submitted Oct. 7, 1976.

Decided Jan. 25, 1977.

Henry ·Halladay (argued), Bernard G. Heinzen and Jay L. Bennett, Minneapolis, Minn., on brief, for appellant.

James S. Simonson (argued), and Jeffrey R. Brooke, Minneapolis, Minn., on brief, for appellees.

Before GIBSON, Chief Judge, and LAY and STEPHENSON, Circuit Judges.

STEPHENSON, Circuit Judge.

This appeal concerns a contract in which Fruehauf Corporation (Magor)[1] agreed to the manufacture, sale and delivery of 500 railroad hopper cars to Soo Line Railroad Company[2] for the approximate price of $9,750,000. Soo Line, in this diversity action initiated against Magor, claims breach of contract and negligence in the manufacture of the railcars, and the district court[3] entered judgment based upon a jury verdict for Soo Line in the amount of $1,238,754.82. Magor appeals contending in general that the trial court erred in failing to construe certain provisions in the contract as barring recovery of damages and in allowing testimony by expert witnesses with´respect to defective manufacture and resultant damages. For the reasons stated below, we affirm.

Magor and Soo Line in 1967 created the contract which provided for Magor to manufacture and deliver 500 covered hopper freight railroad cars at approximately $19,-500 per car according to an agreed design and detailed written specifications. The contract incorporated by reference specifications established by the Association of American Railroads (AAR), an organization of railroads operating in the United States and Canada which adopts minimum uniform standards for the design and construction of railroad cars, including hopper cars.

The agreement was also governed by a document entitled "Terms and Conditions of Sale" which *inter alia* provided that acceptance of the cars was contingent upon inspection by Soo Line and included a warranty provision guaranteeing for one year that the railcars would be free from defects in material and workmanship and in full conformity with the specifications. In general, the warranty provision limited Magor's express obligation to the repair or replacement of any defective parts and provided that the warranty was in lieu of all other express or implied warranties and barred liability for indirect or consequential damages arising from defects in material or workmanship.

Soo Line, a corporation that owns and operates substantial railroad lines and railroad cars, purchased the cars and utilized them pursuant to a long term net lease for public service in hauling grain and other dry bulk commodities. The cars were delivered in early 1968. It is undisputed that, despite an estimated 40-year useful life, the underframes developed serious and widespread cracks in the steel structure and welds within a few months of delivery. Following both unilateral and mutual inspection of the railcars by the parties, Soo Line concluded that the cracks resulted from structural and welding defects and accordingly requested that Magor perform its obligation to repair pursuant to the warranty. However, Magor's management, claiming that the cracking derived from construction specifications required by Soo

---

1. Magor is a division of Fruehauf Corporation and was responsible for manufacture of the cars.

2. Soo Line Railroad Company and D. E. Mundell, as the trustee of equipment trusts owning the railroad cars delivered pursuant to the contract, are referred to as "Soo Line."

3. The Honorable Donald D. Alsop, United States District Judge for the District of Minnesota.

Line, insisted it had no such responsibility. After Magor refused to repair the cars, Soo Line implemented its own remedial operation. The cost of repairs was $506,862.78, slightly more than $1,000 per car. Soo Line has contended, and the jury verdict reflects, that this expenditure did not fully restore the cars to totally acceptable operating condition.

On July 30, 1971, Soo Line filed its complaint claiming breach of express and implied warranties and negligence based on the structural failure of the railroad cars and Magor's refusal to accept responsibility for repair. Magor in its answer denied liability contending that: the railcars met contract specifications; Soo Line's failure to inspect the cars during manufacture barred recovery; damages were limited by the contract; and contributory negligence obviated liability with respect to the negligence count.

Trial commenced on August 13, 1975, and concluded on October 2, 1975, with a jury verdict in favor of Soo Line. The trial court had submitted to the jury a 24-question special verdict form. In answering these questions, the jury essentially found that the railroad cars did not conform to the contract specifications and that Magor had not performed its obligation to repair or replace defective parts. The jury found that Magor breached its express warranty, implied warranties of merchantability and fitness for a particular purpose, and that Magor's negligence caused certain damages arising from the manufacture of the cars. The jury in its special verdicts awarded: $975,970 for the difference between the value of the cars as accepted and their value if built to conform to the contract specifications; $182,444 for revenue lost while the cars were undergoing repairs; and $10,084.93 for damages sustained in transporting the cars in connection with their repair.[4] The trial court adopted the answers in the special verdict and *inter alia* found that Soo Line had sustained $70,255.89, in damages resulting from spoiled ladings caused by

water leakage through defective roofs of the cars. In addition, the district court concluded as a matter of law that the warranty provision in the contract was ineffective in limiting Magor's liability and entered judgment in the total amount of $1,238,754.82. Magor appeals from the denial of its post-trial motions for judgment notwithstanding the verdict or, in the alternative, for a new trial.

### I.

The most significant issue in this appeal is whether either the disclaimer of liability, inspection clause or remedial limitation contained within the contract bars recovery of any or all damages arising from defective manufacture of the railroad cars. Appellant contends, alternatively, that it is exonerated from liability because the contract: disclaimed liability for implied warranties and negligent manufacture; barred recovery in the event of Soo Line's failure to inspect the railroad cars during manufacture; and in any event limited Magor's damages to the reasonable cost of necessary repairs (an amount not exceeding $506,-862.78). In general, appellee asserts that the agreement does not preclude liability for the reasons that: the disclaimer of implied warranties was ineffective because it did not mention the word "merchantability" and is not conspicuous; the inspection clause does not impair any remedy since it relates only to acceptance; and the limited remedy is unenforceable because it failed of its essential purpose. Appellee also contends that the conditions of sale cannot defeat recovery under the negligence count. We consider initially the remedial limitation upon liability arising from breach of the express warranty.

It is undisputed and the district court found that the document entitled "Terms and Conditions of Sale" is a part of the contract between Soo Line and Magor. The warranty provision appearing in this document specifically states:

Line and awarded $699,391.71 for damages sustained as a direct result of such negligence.

---

4. The jury found that 95% of the negligence could be attributed to Magor and 5% to Soo

We will warrant to you (except as to items not manufactured by us) for a period of one year after date of acceptance of each of said cars that they will be free from all defects in material and workmanship under normal use and service, and that the cars will be in full conformity with the specifications referred to herein. Our obligation under this warranty shall be limited to repairing or replacing any part which is found to be defective provided we are notified of the fault or defect when it is first discovered and we are afforded an opportunity for verification, said repairs or replacement to be made at our plant or at such other place as may be mutually agreed upon. This warranty is expressly in lieu of all other warranties expressed or implied, and we shall not be liable for indirect or consequential damages resulting from any such defects in material or workmanship.[5]

The trial court eventually concluded, without articulating a particular reason, that this warranty provision was ineffective to limit Magor's liability.

■ In this diversity case we are, of course, applying the substantive law of Minnesota. It is clear under Minnesota law that parties to a contract may limit or alter the measure of damages recoverable, as by limiting the buyer's remedies to repair and replacement of nonconforming goods or parts. Minn.Stat.Ann. § 336.2–719(1). *See Luick v. Graybar Electric Co.,* 473 F.2d 1360, 1363 (8th Cir. 1973) (Minnesota law applicable); *Kleven v. Geigy Agricultural Chemicals,* 303 Minn. 320, 227 N.W.2d 566, 571 (1975). A limited remedy to repair or replace goods which are initially defective but are promptly remedied by the seller will normally be enforceable. Minn.Stat.Ann. § 336.2–719, Comment 1.

■ Nevertheless, limitations on remedies and damages permissible under section 2–719(1) are subject to section 2–719(2), which states:

Where circumstances cause an exclusive or limited remedy to fail of its essential purpose, remedy may be had as provided in this chapter.[6]

The rationale underlying section 2–719(2) is adequately reflected by the court's statement in *Jones & McKnight v. Birdsboro Corp.,* 320 F.Supp. 39, 43–44 (N.D.Ill.1970):

This Court would be in an untenable position if it allowed the defendant to shelter itself behind one segment of the warranty when it has allegedly repudiated and ignored its very limited obligations under another segment of the same warranty, which alleged repudiation has caused the very need for relief which the defendant is attempting to avoid.

■ In applying section 2–719 to the facts in the instant case, we conclude that the remedial limitation contained within the contract failed of its essential purpose and is therefore unenforceable. The record reveals substantial evidence showing that the railroad cars manufactured by Magor were defective with respect to their structure and the welding of certain crucial joints which precipitated serious cracking in the

5. T. R. Klingel, executive vice president of Soo Line, testified that the warranties given by a manufacturer of railroad equipment are non-negotiable and that in this particular transaction the subject of the warranty never arose during the negotiations.

6. The Minnesota Code Comments reflect that section 2–719(2) is consistent with cases decided prior to Minnesota's adoption of the Uniform Commercial Code in 1961. Under the pre-Code law, where enforcement of a contractual remedy would have been unreasonably harsh, the Minnesota Supreme Court employed strict construction or found a waiver of remedial limitations. *See Detwiler v. Downes,* 119 Minn. 44, 137 N.W. 422 (1912) (waiver); *McCormick Harvesting Machine Co. v. Fields,* 90 Minn. 161, 95 N.W. 886 (1903) (strict construction). We also note that in other jurisdictions courts applying section 2–719(2) have uniformly concluded that a breach by a manufacturer of a limited obligation to repair or replace defective parts caused a limited remedy to fail of its essential purpose. *See Koehring Co. v. A.P.I., Inc.,* 369 F.Supp. 882, 886–92 (E.D.Mich.1974); *Beal v. General Motors Corp.,* 354 F.Supp. 423, 425–28 (D.C.Del.1973); *Jones & McKnight Corp. v. Birdsboro Corp.,* 320 F.Supp. 39, 41–45 (N.D.Ill.1970); *Adams v. J. I. Case Co.,* 125 Ill.App.2d 388, 261 N.E.2d 1 (1970).

underframes of the cars. *See* Part II, *infra.* Even more significant is the jury's answer to question 6(b) of the special verdict form, which states that Magor did not meet its obligation to repair or replace defective parts on the railcars.[7] The jury also found, as reflected by its answer to question 6(a), that Soo Line had promptly notified Magor, pursuant to the contract, of the defects and afforded Magor the opportunity to verify the defects.

There is adequate evidence in the record supportive of the jury's special verdict response indicating that Magor failed to perform its limited contractual responsibility to repair defects in the railcars. On August 6, 1968, shortly after delivery of the railroad cars, T. F. Kearney, Soo Line's chief mechanical officer, sent a letter to R. Mowatt-Larssen, Magor's chief engineer, stating that inspection of the cars had revealed serious cracking in the underframes and roofs and requested Magor's advice on what corrective action should be taken. During August and December, inspections conducted by D. A. Dominquez, an engineer employed by Magor, confirmed the existence of welding defects in key joints connecting steel beams that bolster the floors of the railcars and that support the tremendous forces passing through the frame of the cars. The latter inspections additionally uncovered cracks in roofs and cracks in railcar center plates, a fundamental steel component which provides crucial support for the bolster (underframe) sections of the cars.

Following numerous discussions between personnel of both companies and after frequent requests by Soo Line that Magor remedy the defects, Mowatt-Larssen, representing Magor, denied responsibility for the defects in the bolster area of the railroad cars.[8] Despite additional requests by Soo Line between 1969 and 1971 that Magor accept responsibility for repair of the underframes and roofs of the cars, appellant refused to do so. Finally, Harry W. Crank, Magor's vice president and general manager, in a letter written to T. R. Klingel, Soo Line's vice president, acknowledged Magor's obligation for the roof defects, but reiterated its earlier denials of responsibility for failures in the railcar underframes, specifically the center plate and bolster areas. Based on this evidence, we conclude that the contract's limited remedy of repair failed of its essential purpose, and therefore all available Uniform Commercial Code remedies apply. *See* Minn.Stat.Ann. §§ 336.2–719(2) and 336.2–714.[9]

At this point we must necessarily confront appellant's additional contention that

---

7. A limited remedy fails of its purpose whenever the seller fails to repair goods within a reasonable time. Section 2–719(2) becomes operative when a party is deprived of its contractual remedy and it is unnecessary to prove that failure to repair was willful or negligent. *See Beal v. General Motors Corp., supra,* 354 F.Supp. at 427. *Cf. Koehring Co. v. A.P.I., Inc., supra,* 369 F.Supp. at 891. *See also Riley v. Ford Motor Co.,* 442 F.2d 670, 673–74 (5th Cir. 1971). *See generally* J. White & R. Summers, Handbook of the Law under the Uniform Commercial Code § 12–10 at 382 (1972).

8. Magor's refusal to repair, and in fact the stated reason for denying any responsibility in this litigation, is grounded in its claim that the cracking in the underframes of the railroad cars was precipitated by an oversized non-standard center plate requested by Soo Line. Specifically, Magor engineers stated that the use of a center plate which is 15¾ inches in diameter rather than a standard 13¾ inch center plate created the cracking because of added friction and reverberation between a wider center plate and other parts of the underlying bolster assembly of the cars. Pursuant to its theory that a non-standard center plate was the cause of the problems, Magor recommended the application of stress-resistant "shims" to the underframe sections of 30 cars for test purposes. Before this method of test repair could be applied, however, further cracks were revealed in the test cars, and Magor ultimately denied any responsibility with regard to the railcar center plate problems. In any event, there is substantial evidence in the record reflecting that the cracking resulted from structural defects (certain gaps) and welding defects. Numerous witnesses testified that Soo Line purchased from other manufacturers railcars utilizing the same-sized center plate as employed in the cars manufactured for Soo Line by Magor and that the wider dimension was *not* the cause of the collapse of the Soo Line railcars in this case.

9. *See* notes 6 and 7 and accompanying text *supra.*

the inspection clause in the contract prohibits recovery of damages. The inspection provision contained within the terms and conditions of sale states:

> All construction is subject to inspection by you or your authorized agent who may have access to any part of our plant where any of this work is in progress. Cars to be satisfactory in every respect before acceptance and final inspection and acceptance to be at our plant. Should you waive inspection, then inspection for the Purchaser will be performed by our regular inspection forces and said inspection will constitute acceptance of the cars at our works by your Company.
>
> Notwithstanding any other acceptance point herein called out, specified or agreed upon; the buyer agrees that final inspection will be accomplished at our plant and evidenced by a Certificate or Certificates of Inspection to be signed and delivered by your representative inspector to our Company at the time of final inspection, which Certificate will not conflict or abrogate any other terms pertaining to warranty involved herein.

Magor claims that the inspection clause should bar recovery of damages because Soo Line allegedly failed to undertake inspection of the railroad cars during the manufacturing process. We disagree.

It is not readily apparent that Soo Line exercised review of the actual manufacturing process. Nonetheless, the record reflects that Soo Line did conduct inspections of completed cars at Magor's manufacturing plant. On November 8, 1967, D. W. Paul, Soo Line's assistant superintendent of its car department, participated in a joint inspection with representatives of Magor and other companies on the first of the 500 cars to be completed. This joint inspection specified that the quality of workmanship, particularly welding, was to be improved. On December 11, 1967, after visiting the plant, Paul reported that welding in certain plates and bolsters should be improved. During this visit Paul spot-checked approximately 80 cars, found such a significant number of defects that all of the cars were to be recalled for reworking and received assurances that repairs would be performed from Magor's chief engineer, Rolf Mowatt-Larssen, and its general sales manager, W. F. Lowry. Subsequently, Paul received a telephone call from Lowry indicating that Magor's vice president and general manager, R. Van Hassel, had completed plans to avoid any more "system failures" and had stated that all cars already built would be corrected and then reinspected.

Paul returned to Magor's plant in January 1968. His report at this time revealed various structural alignment problems and numerous welding defects. Paul was telephonically guaranteed once again by Van Hassel that all exceptions noted during the visit would be corrected. The trial testimony of D. A. Dominquez, an engineer for Magor, corroborates Paul's inspection reports showing Soo Line had been assured by Magor that existing defects in the cars would be remedied and that production would be reoriented to avoid problems already discovered.[10]

■ Review of the language in the inspection clause indicates that a waiver of inspection by the purchaser entitled Magor to perform its own inspection and such inspection would have constituted acceptance of the railcars. In any event, the provision neither expressly provides nor even implies that a failure to exercise the right of inspection constitutes a waiver of any other contractual remedy. See generally United States v. Franklin Steel Products, Inc., 482 F.2d 400, 403–04 (9th Cir. 1973), cert. denied, 415 U.S. 918, 94 S.Ct. 1416, 39 L.Ed.2d 472 (1974). When the right to inspect arises after the creation of the contract, as in the instant case, acceptance of goods, even with knowledge that they do not conform to the contract, may preclude rejection but it does

---

10. It should also be emphasized that many of the defects ultimately uncovered were hidden or latent and incapable of detection. For example, "undercut" and "slugged" welding defects were eventually located. These types of welds are difficult to discover and often are a deliberate disregard of welding standards and designed to be hidden from detection.

not impair any other remedy. Minn.Stat. Ann. § 336.2–607(2). *Cf.* Minn.Stat.Ann. § 336.2–316(3)(b) (effect of inspection or refusal of inspection *before* entering into contract).[11] The buyer's right to recover damages for goods that have been accepted but do not conform to the contract is expressly reserved. Minn.Stat.Ann. § 336.2–714(1).

In this case the jury found that Soo Line notified Magor of the faults or defects when they were first discovered and afforded Magor the opportunity to verify and repair or replace the faults or defects at Magor's plant or another place mutually agreeable. The record amply supports the jury's finding in this respect. Accordingly, it is clear that the inspection clause in the contract does not bar liability in the instant case.

 Finally, we consider the question whether Magor should be exonerated from liability for consequential damages because the contract contains a specific bar against such damages existing independently of the exclusive remedy to repair.[12] The Minnesota courts have yet to confront this issue. A federal court must, notwithstanding the absence of a controlling state decision, apply the rule it believes the courts of the state would follow. Accordingly, we conclude that the contract does not effectively bar liability for consequential dam-

ages. *See, e. g., Koehring Co. v. A.P.I., Inc., supra,* 369 F.Supp. at 887–90. Uniform Commercial Code remedies should be liberally administered, Minn.Stat.Ann. § 336.1–106, and a buyer when entering into a contract does not anticipate that the sole remedy available will be rendered a nullity, thus causing additional damages. In addition, the fundamental intent of section 2–719(2) reflects that a remedial limitation's failure of essential purpose makes available all contractual remedies, including consequential damages authorized pursuant to sections 2–714 and 2–715. *See Jones & McKnight Corp. v. Birdsboro Corp.,* 320 F.Supp. 39, 43–44 (N.D.Ill.1970); *Adams v. J. I. Case Co.,* 125 Ill.App.2d 388, 261 N.E.2d 1 (1970). *Cf. Cyclops Corp. v. Home Insurance Co.,* 389 F.Supp. 476, 481–82 (W.D.Pa.), *aff'd,* 523 F.2d 1050 (3d Cir. 1975). *But see County Asphalt, Inc. v. Lewis Welding & Engineering Corp.,* 323 F.Supp. 1300, 1308–09 (S.D.N.Y.1970), *aff'd,* 444 F.2d 372 (2d Cir.), *cert. denied,* 404 U.S. 939, 92 S.Ct. 272, 30 L.Ed.2d 252 (1971). *See generally* J. White & R. Summers, Handbook of the Law under the Uniform Commercial Code § 12–10 at 382 (1972).

 For the reasons outlined above, we hold that neither the remedial limitation, the inspection provision, nor the disclaimer of consequential damages contained within the Soo Line-Magor contract prohibits liability arising from breach of the express warranty.[13] Without the limiting clauses,

**11.** Minn.Stat.Ann. § 336.2–316, Comment 8, states that if a buyer discovers a defect or unreasonably fails to inspect goods prior to use, resulting injuries may be found to result from the buyer's action rather than proximately from breach of warranty. Nevertheless, the evidence supports the jury verdict indicating damages were directly caused by Magor's breach of warranty.

**12.** The jury awarded $262,784.82 in consequential damages, which includes $182,444 for loss of revenue and $70,255.89 for leakage claims paid to shippers.

**13.** Appellant additionally has contended that the agreement disclaimed implied warranties and negligent manufacture and therefore precluded liability upon these theories. It is questionable whether this disclaimer was effective in view of the agreement's failure to provide exclusionary language that is more conspicuous and failure to mention the term "merchant-

ability." Minn.Stat.Ann. § 336.2–316(2). See, *e. g., S–C Industries v. American Hydroponics System, Inc.,* 468 F.2d 852, 855 (5th Cir. 1972). Appellant asserts somewhat persuasively that the requirement of conspicuousness is unnecessary in *situations involving commercially sophisticated parties of relatively equal bargaining strength. Cf. U. S. Fibres, Inc. v. Proctor & Schwartz, Inc.,* 509 F.2d 1043, 1046–47 (6th Cir. 1975). Nonetheless, the need for contractual certainty dictates against abandoning the requirement for a disclaimer to mention the word "merchantability." *See* Minn.Stat.Ann. §§ 336.2–316(2) and 336.2–314, Comment 11. In any event, our holding that the remedial limitation, the inspection clause, and disclaimer of consequential damages did not restrict liability under the express warranty precludes consideration of the viability of the disclaimer and existence of *implied warranties.*

Parenthetically, we observe that the contract neither expressly nor impliedly prohibited lia-

the Uniform Commercial Code remedies apply, including those set out in section 2–714 which allows the buyer damages for nonconforming goods. *See* Minn.Stat.Ann. §§ 336.2–719 and 336.2–714.

## II.

The second issue in this appeal is whether the district court erred in allowing the testimony of H. D. Hollis, an expert witness who testified with respect to the extent of Magor's noncompliance with contractual and industrial manufacturing specifications. There has never been any real dispute between the parties concerning what constituted the contract specifications, but there has been definite disagreement as to the meaning of the specifications about which Mr. Hollis was called as an expert witness by Soo Line to testify.

The aspect of Hollis' testimony to which appellant objects most is that relating to the existence of certain "gaps" between crucial structural members of the underframes of the railcars manufactured for Soo Line by Magor. These gaps, according to Hollis, were prohibited by the contract. Appellant asserts that admission into evidence of this part of Hollis' testimony was erroneous because the contract, including the industrial AAR specifications incorporated into the agreement, in Magor's view clearly and unambiguously permitted gaps in the mounting surface of the railcar center plates.[14] Magor claims in effect that the trial court erred by failing to decide as a matter of law what the contractual specifications require.

The importance and need for expert testimony concerning matters requiring specialized knowledge is highlighted by the specific language of Fed.R.Evid. 702, which states as follows:

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert of knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

Admission or exclusion of expert testimony is a matter within the sound judicial discretion of the trial court, and the trial court's decision should not be reversed unless found to be "manifestly erroneous." *See Salem v. United States Lines Co.*, 370 U.S. 31, 35, 82 S.Ct. 1119, 8 L.Ed.2d 313 (1962); *United States v. Oliver*, 525 F.2d 731, 737–38 (8th Cir. 1975), *cert. denied*, 424 U.S. 973, 96 S.Ct. 1477, 47 L.Ed.2d 743 (1976); *Associated Dry Goods Corp. v. Drake*, 394 F.2d 637, 645 (8th Cir. 1968).

In turning to review Mr. Hollis' qualifications as an expert witness, the prevailing standard is that a trial judge's determination of the qualifications of a witness is conclusive unless shown to be an abuse of judicial discretion or a clear error of law. *See Gisriel v. Uniroyal, Inc.*, 517 F.2d 699, 701–02 (8th Cir. 1975); *Holmgren v. Massey-Ferguson, Inc.*, 516 F.2d 856, 857–58 (8th Cir. 1975); *Havenfield Corp. v. H & R Block, Inc.*, 509 F.2d 1263, 1272 (8th Cir.), *cert. denied*, 421 U.S. 999, 95 S.Ct. 2395, 44 L.Ed.2d 665 (1975). *See also Mustang Fuel Corp. v. Youngstown Sheet & Tube Co.*, 516 F.2d 33, 37 (10th Cir. 1975). The record in the instant case reveals that Hollis possessed sufficient if not excellent qualifications in the area of railcar design and construction.

Hollis, who graduated from Georgia Institute of Technology in mechanical engineering during 1926, has been associated with railroads all of his life. Employed by the Texas & Pacific Railroad in 1926, he worked originally in freight and passenger car repair and later as a draftsman in the analysis, design and development of railroad cars. After becoming a mechanical engineer responsible for railcar design, Hol-

---

bility for negligent manufacture. *See Berwind Corp. v. Litton Industries, Inc.*, 532 F.2d 1, 3–7 (7th Cir. 1976). Although if liability were based on negligence alone, damages would be less in light of the jury award of $699,391.71 on

that count; the jury determined that $1,168,499 was appropriate for breach of contract.

14. Center plates are steel components providing support for the bolster or underframe of the railcars.

lis headed a department involved in quality control for covered hopper cars, similar to those in the instant case. Hollis also became involved in development of the welding techniques used in the construction of railcar underframes. He continued his engineering responsibilities at Texas & Pacific until 1965 and since that time has been employed in other facets of railcar design and construction. Notably, Hollis has been active on various committees of the mechanical division of the Association of American Railroads (AAR) charged with setting minimum and uniform standards in the design of railcars. In light of these objective qualifications, Hollis expressed the opinion that he was familiar with generally prevailing standards of good workmanship and sound railcar building practice.

In analyzing the substance of Hollis' testimony concerning Magor's noncompliance with the contract, it appears that his testimony was admissible as an expert's interpretation of complex technical construction specifications contained in the agreement. *See* Fed.R.Evid. 702; *Gisriel v. Uniroyal, Inc., supra,* 517 F.2d at 701–02. Soo Line and Magor stipulated as to what constituted the contract specifications but are in serious disagreement as to their interpretation. These manufacturing standards provided in general that: "[a]ll parts of the car shall be fabricated, assembled and finished in a thoroughly workman-like manner." The agreement also incorporated by reference AAR specifications setting forth more exact minimum standards. In addition to requiring generally that cars "must be built in the best, most substantial and workmanlike manner," the AAR specifications state more specifically that the mounting surfaces of the railcar center plates "must be perpendicular to the vertical center line of the truck center plate." These specifications also require that if the "as cast" or "as forged" mounting surface does not meet such requirements "it must

be machined or machine ground to conform therewith."

Hollis testified that in his opinion minimum standards of car building practice, particularly as reflected by the AAR specifications prevailing in 1967 and 1968, required that the mounting surface of a railcar's center plate should be flat. This flatness, according to Hollis, is necessary to insure the center plate can carry the weight of the car and its lading and not flex and crack under the load. In addition, Hollis testified that before a car builder can properly apply a center plate which is not flat on the mounting surface, the builder must straighten the plate, either by heating and pressing or by machining. Hollis further opined that flatness of center plates was a mandatory principle of good workmanship and required by the particular standards and specifications incorporated into the Soo Line-Magor contract. Most significantly, Hollis testified that the railcars constructed for Soo Line by Magor did not conform to such requirements in light of his inspection of numerous cars revealing concave center plates with gaps in the mounting surface of the plates rather than the flatness required in his opinion.[15]

In view of the evidence discussed above, the trial court's admission into evidence of Hollis' testimony certainly is not "manifestly erroneous." Accordingly, we reject appellant's contention that Hollis' opinion, stating gaps were prohibited by the contract, contradicted specifications in the agreement which allegedly permitted gaps. In our view, Hollis' testimony with respect to the defective nature of these "gaps" was a reasonable interpretation of the contractual manufacturing standards.

In any event, the record reveals substantial evidence received without objection corroborating Hollis' testimony that Magor did not comply with the manufacturing standards and independently supports

---

**15.** Inspections conducted by Hollis revealed that 80% of the railcar center plates were cracked; more than 60% of the plates were concave on the mounting surface; and over 80% of support parts adjacent to the center plates were installed out of position. These cracks were described as "very serious." In addition, a high percentage of rivets holding the center plates were found to be loose or missing.

the jury's finding of breach of contract. *See Weil v. Keshner,* 300 F.2d 500, 504 (8th Cir. 1962). For example, R. E. Johnson, a mechanical engineer who directs development and design of railcars for the Burlington Northern Railroad, confirmed Hollis' opinion as to the need for a flat mounting surface of a railcar center plate. E. H. Weston, an expert witness called by Magor, conceded that car builders for whom he had worked ground the mounting surfaces of center plates to assure a good, sound, flat bearing surface. John Getz, a Magor employee whose testimony was additionally supported by H. W. Pettit, a mechanical engineer called as a defense witness, also testified that gaps adjacent to the center plates permit flexing of components which may lead to cracking in the underframe of the railcar. D. A. Dominquez, an engineer employed by Magor, admitted that Magor's engineers were concerned during the manufacturing process with the alignment of the center plate and acknowledged that flexing of components in the underframe area of the cars can lead to failure. Most notably, shop inspection reports prepared by Magor engineers reflect that Magor's employees realized gaps in the railcar center plate area existed and that such gaps were violative of the AAR specifications.

Finally, portions of Hollis' and other witnesses' testimony indicating the defective nature of Magor welding practices independently support the conclusion that the railcars did not conform to the contract. Inspections conducted by Hollis uncovered the existence of a significant percentage of "slugged"[16] or "undercut"[17] welds at crucial joints in the underframes of the railcars. The inspection revealed that 69% of the welds at one joint and 39% at another were cracked. Apparently some required welds were omitted entirely in construction of the cars. Hollis testified that the slugged and undercut welds found in the cars manufactured by Magor were violative of both the contractual welding standards and general principles of proper car building. These welding defects, the existence of which is basically undisputed,[18] were described by Hollis and confirmed by R. E. Johnson as a cause of the cracking in the railcar underframes.

Under all of these circumstances, we conclude the trial court did not commit an abuse of discretion in the admission into evidence of Hollis' testimony concerning Magor's failure to conform to the contractual manufacturing specifications.[19]

### III.

The third issue in this appeal is whether the district court erred in allowing the testimony of T. R. Klingel, an expert witness who testified with respect to the diminution in value of the railroad cars resulting from their structural collapse. In general, Klingel expressed the opinion that the market value of the railcars as actually constructed was approximately $1,000,000 or $2,000 per

---

16. A "slugged" weld is one in which the welder fills the weld area with unmelted rods so as to speed up the work and hides his improper procedure with a superficially good weld.

17. An "undercut" weld is one in which improper techniques result in a reduction in the thickness of the parent metal, with consequential weakness.

18. Appellant claims there is no evidence in the record affirmatively showing the collapse of the railcars was caused by welding problems as opposed to other causes, such as an oversized center plate. As previously indicated, however, there is substantial evidence showing that the larger-diameter center plate did not precipitate the failures.

19. Appellant also infers that the trial court erred in failing to submit a special verdict form which reflected absolutely that the AAR specifications were incorporated into the contract. As previously stated, there has never been any dispute between the parties and the agreement clearly states the AAR specifications were a part of the contract. Special verdict question No. 1 asked: "Did the cars built by Magor for Soo Line conform to the contract specifications set forth in Plaintiffs' Trial Exhibit Number C–17?" The court did not commit an abuse of discretion in consolidating subissues concerning the standard of car building and conformity to that standard. *See* Fed.R.Civ.P. 49(a); *McDonnell v. Timmerman,* 269 F.2d 54, 58 (8th Cir. 1959).

car less than the value of the cars had they been built in accordance with the contract.

Klingel, who is executive vice president of Soo Line, testified initially that the market value of the railcars had they been constructed according to the contract would have approximated their purchase price of $19,500 per car. He further expressed the opinion, over Magor's objection, that the fair market value of the cars as actually constructed was at the most $17,500 per car. Klingel's opinion, as to the diminution in fair market value of the railcars, basically derived from his viewpoint that a hypothetical buyer of the cars would be confronted with immediate and substantial expenditures for repair and continuation of financing costs without any concomitant receipt of revenue while the railcars were out of service being repaired, and even after the repairs the buyer would possess rebuilt and patched cars worth less than those properly constructed.

Appellant contends that the trial court erred in allowing Klingel's testimony on damages. In Magor's view, Klingel was not qualified to provide expert opinion on the necessity and cost of repair because he allegedly did not possess sufficient practical or technical knowledge. Magor asserts additionally that Klingel's prediction of future maintenance costs was speculatively improper without proof that such damages are reasonably certain to occur. Finally, Magor claims that Klingel's reliance on financing costs as a basis for damages erroneously resulted in a duplicate consequential damage award for revenue lost while the railcars were being repaired.[20]

 The trial court's determination that Klingel possessed adequate qualifications, pursuant to Fed.R.Evid. 702, to testify with respect to the diminished market value of the railcars was not an abuse of discretion or clear error of law. *See Gisriel v. Uniroyal, Inc., supra,* 517 F.2d at 701–02; *Havenfield Corp. v. H & R Block, Inc., supra,* 509 F.2d at 1272. *See also Mustang Fuel Corp. v. Youngstown Sheet & Tube*

*Co., supra,* 516 F.2d at 37. Fed.R.Evid. 702 is not limited to experts in the strictest sense of the word but also encompasses a large group called "skilled" witnesses, such as owners, bankers, and landowners testifying on the value of property. *See, e. g., Kestenbaum v. Falstaff Brewing Corp.,* 514 F.2d 690, 698–99 (5th Cir. 1975).

Klingel's responsibilities as Soo Line's executive vice president included overseeing the operations of all trains and the maintenance of all rolling stock and fixed property. He also was charged with determination of the market value of the railroad's rolling stock. Klingel was directly familiar with the railcars manufactured by Magor, and he collaborated closely with Soo Line's mechanical department and H. D. Hollis concerning the problematic conditions in the Magor-constructed railcars. In some instances, Klingel conducted personal inspections of the railcars. Klingel's knowledge was such that his opinion on valuation most likely assisted the trier of fact in arriving at the truth. *See, e. g., Holmgren v. Massey-Ferguson, Inc., supra,* 516 F.2d at 858.

 In reviewing the substance of Klingel's testimony on valuation, the measure of damages and the limits of relevancy are set by the substantive law of Minnesota. *See Johnson v. Serra,* 521 F.2d 1289, 1294 (8th Cir. 1975). Under Minnesota law, the measure of damages applicable to breach of contract is the difference between the actual value of the cars at the time of acceptance and the value they would have had if they had been as warranted. Minn.Stat. Ann. § 336.2–714(2). *See Kleven v. Geigy Agricultural Chemicals,* 303 Minn. 320, 227 N.W.2d 566, 569 (1975); *Northern Petrochemical Co. v. Thorsen & Thorshov, Inc.,* 297 Minn. 118, 211 N.W.2d 159, 165 (1973); *Truesdale v. Friedman,* 270 Minn. 109, 132 N.W.2d 854, 865 (1965). The buyer is not limited to repair costs when repair does not completely restore the goods to the value which they would have had if built in conformity with the contract; remaining dimi-

---

**20.** In this regard, it should be noted that the jury awarded $182,444 for net loss of revenue

sustained by Soo Line while the cars were undergoing repairs.

nution in value may also be recovered. *See, e. g., Northern Petrochemical Co. v. Thorsen & Thorshov, Inc., supra,* 211 N.W.2d at 165.

Taking into consideration the structural and welding defects existing in the cars manufactured for Soo Line by Magor, Klingel expressed the opinion that the reasonable market value per car was $17,500 at the most. Klingel further opined that he would probably discount the purchase price of the cars by an additional $1,000 or $2,000, which would result in a fair market value of approximately $15,500 per car.

█ In formulating the diminution in fair market value of the cars, Klingel properly placed reliance on the necessity for present and future repairs and the fact that even a rebuilt patched railcar would be worth less than a correctly constructed one. *See Northern Petrochemical Co. v. Thorsen & Thorshov, Inc., supra,* 211 N.W.2d at 165. The record reflects that approximately $1,000 per car in immediate repair costs was expended by Soo Line and that, even after implementation of the repairs, Soo Line had experienced continued maintenance costs beyond those expended for cars other than those manufactured by Magor.

█ Klingel also stated that a hypothetical buyer of the railcars would discount the purchase price because the buyer's financing costs would continue while the cars were out of service being repaired with no ability to generate revenue. Klingel testified that approximately $200,000 or $400 per car in interest payments would be lost without concomitant benefit during repairs. This statement, of course, may not be considered as evidence of diminution in value of the Soo Line railcars. Cost of financing is not an element of reduced market value pursuant to Minn.Stat.Ann. § 336.2–714. Nonetheless, we reject appellant's contention that this aspect of Klingel's testimony rendered inadmissible his overall opinion on the diminution in market value of the railcars. An objection that an expert's opinion is based on elements of damage not lawfully recoverable generally relates to the weight rather than the admissibility of the

testimony. *See Kestenbaum v. Falstaff Brewing Corp., supra,* 514 F.2d at 698–99. *Cf. Klapmeier v. Telecheck International, Inc.,* 482 F.2d 247, 252–53 (8th Cir. 1973).

In addition, the trial court carefully instructed the jury with respect to this element of damages. It stated in part as follows:

> The measure of damages is, generally speaking, the difference between the fair market value of the cars as accepted by Soo Line, and the fair market value they would have had if they had not been deficient in the particulars in which you found them deficient. This is called the difference or diminution in value approach.
>
> * * * * * *
>
> If you find that the repair of the cars restored the cars to substantially the same condition as they would have been in if properly manufactured, the difference or diminution value is the same as the reasonable cost of repairing the cars.
>
> So, if the repair costs actually restored them then the repair cost would equal the diminution in value. However, if you find that the repair of the cars did not restore them to substantially the same condition as they would have been if properly manufactured, then the difference or diminution in value is the reasonable cost of repair, plus the difference between the fair market value of the covered hopper cars if they had been manufactured without faults or defects, and the fair market value of the repairs.
>
> The total figure, however, cannot exceed the difference between the fair market value as accepted, and the fair market value in the defective condition you find.
>
> * * * [The court then gave an illustration.]
>
> Therefore, if you find that the repairs of the cars placed the cars in a better condition than they would have been at the time of acceptance if they had been properly manufactured, then the difference or diminution in value recoverable by plaintiffs is the difference between

the fair market value of the covered hopper cars as accepted by Soo Line and the fair market value they would have had if Magor had manufactured them properly. So, Soo Line in this situation would not be able to recover the full amount spent for repairs.

In the course of the charge and the special verdict you will find use of the word value. Value is described as the highest price in terms of money for which a product would have sold on the open market, the seller having a reasonable time within which to sell and being willing to sell but not forced to do so; the buyer being ready, willing and able to buy, but not forced to do so, and a full opportunity to inspect the property in question and to determine its condition, suitability for use, and all things about the property that would naturally and reasonably affect its market value.

 Moreover, there is sufficient evidence in the record upon which the jury could have relied in awarding $975,970 or $1,951.94 per car, approximately 10% of their original cost, for diminution in market value of the cars. It cannot be said that the verdict constituted a shocking result. *See Richardson v. Communications Workers,* 530 F.2d 126, 129–30 (8th Cir.), *cert. denied,* —— U.S. ——, 97 S.Ct. 77, 50 L.Ed.2d 86 (1976); *Century "21" Shows v. Owens,* 400 F.2d 603, 611–12 (8th Cir. 1968).

 For similar reasons, we reject appellant's assertion that Klingel's reference to "future maintenance costs" was unduly speculative and erroneous. Klingel merely expressed an opinion on the present value of the railcars at the time of acceptance in light of known risks associated with existing defects. Soo Line had already experienced increased maintenance costs with Magor cars previously repaired. Klingel's testimony overall had sufficient probative value to outweigh the danger that it would lead the jury to assess damages on an improper basis. *Cf. Johnson v. Serra, supra,* 521 F.2d at 1293. Magor had adequate opportunity to cross-examine and refute

Klingel's testimony on valuation. *See Polk v. Ford Motor Co.,* 529 F.2d 259, 271 (8th Cir.), *cert. denied,* 426 U.S. 907, 96 S.Ct. 2229, 48 L.Ed.2d 832 (1976). Under these circumstances, we conclude that the trial court did not commit an abuse of discretion in the admission of Klingel's testimony concerning the diminution in market value of the railroad cars resulting from their structural failure.

Upon full consideration of the lengthy record [21] including over 4500 pages of testimony, hundreds of exhibits and the court's instructions to the jury, we are satisfied that no prejudicial error appears. The evidence supports the verdicts of the jury and the judgment rendered in accord therewith.

Affirmed.

---

21. The trial extended over a seven-week period.